[No. 47968–2.   En Banc.   September 15, 1983.]

JIM CHAMBERS–CASTANES, ET AL, *Appellants,* v. KING COUNTY, ET AL, *Respondents.*

*Thomas B. Nast* and *Fred Diamondstone,* for appellants.

*Norm Maleng, Prosecuting Attorney,* and *Michael C. Duggan* and *Patrick J. Schneider, Deputies,* for respondents.

STAFFORD, J.—We are asked to decide whether appellants, Jim and Steve Ann Chambers–Castanes, may bring suit against respondents King County, the King County Department of Public Safety (King County Police), and the King County Sheriff for their failure to respond in a proper and timely manner to appellants' call for assistance. Specifically, the Chambers–Castanes alleged that (1) respondents' conduct negligently caused them to suffer severe emotional distress; (2) respondents' extreme and outrageous conduct recklessly caused them to suffer severe emotional distress; and (3) respondents' negligent performance of their duties caused them to lose any cause of action they might have had against their assailants.

The trial court granted respondents' motion to dismiss pursuant to CR 12(b)(6) and found the County, its police force, and the Sheriff owed no duty to respond to appellants' emergency calls. We agree only as to the dismissal of the last claim relating to appellants' loss of a cause of action against their assailants. As to the first two claims, we find appellants have stated a cause of action for negligent infliction of emotional distress and for outrage. Thus, the dismissal of these two claims was improper.

■ Since this matter has come before us on a CR 12(b)(6) motion, we must treat all facts alleged by appellants and the reasonable inferences therefrom as true. *Corrigal v. Ball & Dodd Funeral Home, Inc.,* 89 Wn.2d 959, 577 P.2d 580 (1978); *Green v. Holm,* 28 Wn. App. 135, 622

P.2d 869 (1981).

Steve Ann and Jim Chambers–Castanes were driving through the town of Woodinville at approximately 5:50 p.m. on April 22, 1980. Their automobile was stopped in traffic behind a pickup truck occupied by three men. Two of the men exited the truck and approached the Chambers–Castanes car. Jim Chambers–Castanes left his vehicle to see what the two men wanted. Without warning, both men struck Mr. Chambers–Castanes, knocked him down, and continued beating him. Ms. Chambers–Castanes was also struck and manhandled by one of the men. The third man, who had remained in the truck, drove off. The two assailants left the immediate area on foot, but remained in a nearby open field. A number of people kept the assailants under surveillance in the field from approximately 6 p.m. to 7:20 p.m.

Several observers, including Ms. Chambers–Castanes, notified the King County Police Department of the incident. The King County police operators received a total of 11 calls for assistance from the time of the beatings (approximately 5:50 p.m.) until the police arrived approximately one hour and twenty minutes later.

The contents of the calls may be summarized as follows: At 5:52 p.m. Rose Ranfeldt called the King County police emergency number and reported that a man in a pickup truck had just forced another vehicle off the road in downtown Woodinville and was beating up the driver. Within a little over a minute of Ranfeldt's call, Rick Price, Kit Johnson, and the Bothell Police Department each called the King County police emergency number to report that two men were beating up a third man. According to police reports, a police car was actually dispatched in response to those calls. At approximately 5:55 p.m., about 30 seconds after the Johnson call, Rick Price called again to report that the people involved in the fight "all jumped in their cars and took off." The police reports indicate that upon receipt of this call, the police car which had been dispatched was informed no one was at the scene. Conse-

quently the officers did not continue on to Woodinville.

Five minutes after Price's second call, which resulted in a recall of the police car, Ranfeldt again called the King County emergency number and said "these guys keep coming after these people and these people are out here now and they need the police." A police operator replied, "Okay. We have the officers on their way out there right now." When Ranfeldt asked whether the officers would arrive within a few minutes, the police operator replied, "Yeah."

At 6:27 p.m., nearly one-half hour later, Steve Ann Chambers–Castanes herself called King County police emergency for the first time and reported that "two drunk, mean individuals" had just severely beaten her husband, Jim, at the main intersection in Woodinville. Steve Ann also said "[T]his is the fifth call. No one has responded. It's been a half–hour." A police operator replied: "We've gotten calls from there, ma'am, several calls saying that the fight was ended, that everyone parted." Steve Ann then said, "That is not the truth! . . . [t]hey are dangerous and they are threatening other people that are still in the area." By this time, Steve Ann's husband and several other witnesses had chased the assailants under a railroad trestle. Steve Ann was very upset because she too had been assaulted, although not as severely as her husband. The police operator told her: "You'd better calm down or I won't send anybody." After Steve Ann gave a more specific description of her location, the police operator said, "All right, we'll get somebody up there then." Police reports indicate no one was dispatched to Woodinville at this time.

Thirteen minutes later, at 6:40 p.m., Steve Ann called a second time and said the witnesses were surrounding the assailants. "We need some police here, there shouldn't be any trouble." The police operator initially stated other people had called and canceled the request for assistance, but after Steve Ann said "No . . . don't," the operator apparently asked a fellow operator about the status of the incident. When the operator came back on the line, Steve Ann was told, "We have the officer; he is on the way."

Police reports indicate that an officer had not, in fact, been dispatched.

At 6:51 p.m., and again 3 minutes later, an unidentified person called King County police emergency to complain about the slow police response to the assault in Woodinville. This caller was told the police "are almost there now. In fact they are probably there." Police reports indicate, however, no officer had been sent.

At 6:56 p.m., Steve Ann called a third time to ask whether anybody had been dispatched to the Woodinville intersection. She was told, "Yes, they're on their way . . . they'll be there momentarily." Steve Ann then told the police operator that the assailants were "surrounded by a lot of people who stopped to help out, but we really need some assistance." The police operator replied, "They'll be there just anytime now. They're on their way." The police reports indicate that officers were dispatched to Woodinville at the time this call was received (*i.e.*, at approximately 6:56 p.m.).[1]

According to police reports, two police officers arrived at approximately 7:12 p.m. Steve Ann asked the officers to look for her husband and the suspects on foot. According to the police reports, the officers did not conduct a search at that time, however, because the search area was so large and because Steve Ann was upset and unable to give a description of the suspects. At 7:30, Jim Chambers–Castanes returned from the field into which the assailants had fled. The police reports indicate that Jim Chambers–Castanes was extremely angry at the police for having taken so long to arrive. The reports state that after Jim calmed down, the officers obtained a description of the suspects and began searching the area.

A third officer arrived at the scene between 8:45 and 9 p.m., at which time the search for the suspects was sus-

---

[1]It should be noted that during the time in question the calls were received by a series of separate police emergency operators at different operation positions rather than by one operator–dispatcher.

pended. Thereafter, Jim and Steve Ann Chambers–Castanes departed for the University Hospital to obtain medical care for Jim.

Appellants do not seek damages for the injuries suffered from the beating by assailants. All parties agree the King County Police could not have prevented the incident. Appellants contend, however, that King County, the King County Police, and the Sheriff are liable for damages suffered by the failure of the police to respond in a timely manner. The damages alleged include emotional distress and the loss of a cause of action against the assailants in that they were never apprehended.

I

The threshold question is whether the County, the Department of Public Safety, and the Sheriff are immune from such a suit. In its opinion granting respondents' motion to dismiss, the trial court implied respondents were immune from suit, holding that the determination of "[h]ow police resources will be used in responding to calls for help, investigating alleged criminal activity or enforcing the law necessarily and unavoidably involves a great deal of discretion and prompt decision making." We find, however, the statement is overly broad and does not accurately state the limited exception to governmental immunity. Under the facts of this case, we hold respondents are not immune from suit.

■■ The Legislature abolished the doctrine of sovereign immunity through enactment of Laws of 1961, ch. 136, § 1, p. 1680 (RCW 4.92.090) and Laws of 1967, ch. 164, § 1, p. 792 (RCW 4.96.010). We have recognized a narrowly circumscribed exception to this rule in instances involving high level discretionary acts exercised at a truly executive level. *Evangelical United Brethren Church v. State,* 67 Wn.2d 246, 407 P.2d 440 (1965).[2] *See also Cougar Business*

---

[2]In determining whether an act falls within the exception, the court must consider the following four questions:

(1) Does the challenged act, omission, or decision necessarily involve a basic

*Owners Ass'n v. State,* 97 Wn.2d 466, 647 P.2d 481 (1982); *Mason v. Bitton,* 85 Wn.2d 321, 534 P.2d 1360 (1975); *King v. Seattle,* 84 Wn.2d 239, 525 P.2d 228 (1974). A governmental entity's exercise of discretionary acts at a basic policy level is immune from suit, whereas the exercise of discretionary acts at an operational level is not. *Mason,* at 328. The purpose of such an exception is to preserve the integrity of our system of government by ensuring that each coordinate branch of government may freely make basic policy decisions.

To fall within this exception, however, the discretionary act must not only *involve* a basic policy determination, but must also be the product of a *considered* policy decision. As we said in *King v. Seattle, supra,* at page 246: "The fact that an employee normally engages in 'discretionary activity' is irrelevant if, in a given case, the employee did not render a considered decision."

A simple decision whether to dispatch an officer to the scene of a crime or to investigate a crime, without more, does not involve a basic policy decision by a high level executive which would render the decision maker immune from suit. Rather, the decision is more properly characterized as operational, for it involves a type of discretion exercised at an everyday operational level. Support for this position is found in *Mason v. Bitton, supra,* wherein we held that the City of Seattle and the State were not

---

governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Evangelical United Brethren Church v. State,* 67 Wn.2d 246, 255, 407 P.2d 440 (1965). If these four questions can be answered in the affirmative, then the challenged act falls within the exception of governmental immunity. If one or more of the answers are negative, then further inquiry is necessary, depending upon the facts and circumstances involved.

immune from suit for damages resulting from a high speed chase by the Seattle Police Department and the Washington State Patrol in which they attempted to apprehend a traffic violator:

> We are fully convinced that the initial decision to give or not to give chase, and the decision as to whether to continue the pursuit are properly characterized as *operational,* and not the "basic policy decision" discussed in *King* [*v. Seattle,* 84 Wn.2d 239, 525 P.2d 228 (1974)], at page 246. To now hold that this type of discretion, exercised by police officers in the field, cannot result in liability under RCW 46.61.035, due to an exception provided for basic policy discretion, would require this court to close its eyes to the clear intent and purpose of the legislature when it abolished sovereign immunity under RCW 4.96.010. If this type of conduct were immune from liability, the exception would surely engulf the rule, if not totally destroy it.

*Mason,* at 328–29.

Two recent Court of Appeals decisions, however, purport to extend the doctrine of limited governmental immunity to *all* discretionary acts. *See Clipse v. Gillis,* 20 Wn. App. 691, 582 P.2d 555 (1978); *Moloney v. Tribune Pub'g Co.,* 26 Wn. App. 357, 613 P.2d 1179 (1980). In *Clipse,* relied upon by the trial court herein, the Court of Appeals held police officers were immune from suit when investigating criminal complaints because such activity was of a discretionary nature. The Court of Appeals relied on *Clipse* in rendering its decision in *Moloney* wherein it granted immunity to police officers engaged in the act of releasing investigation information to the press. In both *Clipse* and *Moloney,* the Court of Appeals categorized the police conduct at issue as discretionary and failed to determine whether the challenged conduct involved a basic policy decision by an executive level officer, as required under *Evangelical, King,* and *Mason.* We now expressly disapprove of the two decisions to the extent they conflict with our prior case law and with the decision we announce today.

## II

Having disposed of the "immunity" issue, we now turn to appellants' contention that the trial court erred by dismissing their cause of action for negligent infliction of emotional distress. The trial court dismissed appellants' complaint on the ground that the duty owed by respondents to provide assistance was owed to the public generally and not to any particular individual. Consequently, it was determined the inaccurate information furnished by the police operators, indicating help was on the way, was not a proximate cause of appellants' damages. We disagree, and find appellants have adequately alleged facts giving rise to a special duty owed by respondents.

A cause of action for negligence will not lie unless the defendant owes a duty of care to plaintiff. *See Morgan v. State,* 71 Wn.2d 826, 430 P.2d 947 (1967). Appellants contend law enforcement agencies have a statutory duty to provide police protection *(see* RCW 36.28.010 requiring that the sheriff and deputies "[s]hall keep and preserve the peace" and "arrest . . . all persons who break the peace, or attempt to break it") and that municipalities have a common law duty to provide such protection *(Walters v. Hampton,* 14 Wn. App. 548, 551, 543 P.2d 648 (1975)). While this may be true in a broad sense, we have consistently held that absent a clear legislative intent or clearly enunciated policy to the contrary, these duties are owed to the public at large and are unenforceable as to individual members of the public. *See Baerlein v. State,* 92 Wn.2d 229, 595 P.2d 930 (1979); *Halvorson v. Dahl,* 89 Wn.2d 673, 676, 574 P.2d 1190 (1978); *Mason v. Bitton, supra; Campbell v. Bellevue,* 85 Wn.2d 1, 530 P.2d 234 (1975). *See also Stranger v. New York State Elec. & Gas Corp.,* 25 A.D.2d 169, 268 N.Y.S.2d 214 (1966); *Motyka v. Amsterdam,* 15 N.Y.2d 134, 204 N.E.2d 635, 256 N.Y.S.2d 595 (1965).

In *Mason,* we concluded such a clear legislative intent was present in that RCW 46.61.035, which authorized drivers of an emergency vehicle to disregard traffic regulations, specifically provided that the act would not "protect the

driver from the consequences of his reckless disregard for the safety of others." RCW 46.61.035(4). Parenthetically, it should be noted that our policy is consistent with the majority of jurisdictions that have addressed this question. *See* Annot., *Liability of Municipality or Other Governmental Unit for Failure to Provide Police Protection,* 46 A.L.R.3d 1084 (1972).

We have recognized an exception and have imposed liability in cases "where a relationship exists or has developed between an injured plaintiff and agents of the municipality creating a duty to perform a mandated act for the benefit of particular persons or class of persons".[3] *Campbell v. Bellevue, supra* at 10. *Accord, Swanner v. United States,* 309 F. Supp. 1183 (M.D. Ala. 1970) (undercover agent who had been threatened and subsequently harmed after testifying on behalf of government); *Morgan v. County of Yuba,* 230 Cal. App. 2d 938, 41 Cal. Rptr. 508 (1964) (failure to give a promised warning concerning the impending release of a dangerous person); *Gardner v. Chicago Ridge,* 71 Ill. App. 2d 373, 219 N.E.2d 147 (1966), *later appeal,* 128 Ill. App. 2d 157, 262 N.E.2d 829 (1970), *cert. denied,* 403 U.S. 919, 29 L. Ed. 2d 696, 91 S. Ct. 2230 (1971) (witness summoned by police to make an identification of alleged assailant). In *Campbell,* plaintiff brought a wrongful death action against the City of Bellevue alleging that the City knew of a defect in wiring, failed to comply with the city ordinance requiring severance of the lighting system until compliance was achieved, and caused plaintiff to rely on an assurance that the situation had been corrected. We held a special relationship arose between the plaintiff and the

---

[3]We have also recognized an exception arising in situations where a governmental entity or its agent undertakes a duty to aid or warn a person in danger and fails to exercise reasonable care, and the offer to render aid is relied upon by either the person to whom the aid is to be rendered or by another who, as a result of the promise, refrains from acting on the victim's behalf. Under this exception, commonly referred to as the rescue doctrine, the governmental entity may be liable even if the agent acts gratuitously or beyond his or her statutory authority. *See Brown v. MacPherson's, Inc.,* 86 Wn.2d 293, 545 P.2d 13 (1975) and cases cited at page 299. *See also United States v. DeVane,* 306 F.2d 182 (5th Cir. 1962).

City, thereby rendering the City subject to tort liability.

From the aforementioned cases, it appears then that an actionable duty to provide police services will arise if, (1) there is some form of privity between the police department and the victim that sets the victim apart from the general public (*Tampa v. Davis,* 226 So. 2d 450, 454 (Fla. Dist. Ct. App. 1969)), and (2) there are explicit assurances of protection that give rise to reliance on the part of the victim (*Sapp v. Tallahassee,* 348 So. 2d 363, 365–66 (Fla. Dist. Ct. App. 1977)).[4] *Warren v. District of Columbia,* 444 A.2d 1, 10 (D.C. 1981) (Kelly, J., concurring in part and dissenting in part).

The term privity is used in the broad sense of the word and refers to the relationship between the police department and any "reasonably foreseeable plaintiff". *See Warren v. District of Columbia, supra* at 10.[5] *See generally Halvorson v. Dahl,* 89 Wn.2d 673, 676–77, 574 P.2d 1190 (1978). As to the second element, the assurances need not always be specifically averred, as some relationships carry the implicit character of assurance. *See generally Halvor-*

---

[4]Certainly, an actionable duty to provide police services may also arise under the rescue doctrine. See footnote 3. Such a theory is, however, inapposite under the facts of this case.

[5]We expressly reject the approach of the majority opinion of the District of Columbia Court of Appeals (to be distinguished from the United States Court of Appeals for the District of Columbia) wherein that court appeared to effectively foreclose any possibility of holding police officers liable for the failure to respond to requested assistance regardless of the exigent circumstances. *See Warren v. District of Columbia,* 444 A.2d 1 (D.C. 1981). In *Warren,* cited by respondents, the court dismissed an action brought by three women against the District of Columbia Police Department for damages suffered while being held hostage, raped and brutalized by their assailants for 14 hours. Without reciting the distasteful facts, it is sufficient to say the court held the police owed no duty to provide the women with adequate police protection subsequent to their arrival on the scene. It concluded there was no special relationship giving rise to such an actionable duty.

Clearly *Warren* reached its unfortunate result with a view wholly at odds with this court in the area of privity, actionable duty, the existence of a special relationship between the victim and the police, the rescue doctrine, as well as the abolition of sovereign immunity and the very limited exceptions thereto.

*son; Campbell.*

Privity existed between appellants and respondents, as evidenced by the transcript of the police tape log which contains statements by the dispatchers to Steve Ann Chambers–Castanes assuring her help was on the way. Reliance also was present, at least for purposes of a CR 12(b)(6) motion, in that reliance was alleged in appellants' amended complaint. Although appellants may have difficulty proving their claims and the damages caused by their alleged reliance, we find the allegations alone are sufficient to withstand a CR 12(b)(6) motion. *See Halvorson,* at 674–75.

As we said in *Brown v. MacPherson's, Inc.,* 86 Wn.2d 293, 297, 545 P.2d 13 (1975):

> We need not determine that the story related by counsel is true, or even that it is supported by some evidence, to use it as a context for consideration of the State's dismissal motion. All we need decide is whether the facts described, if established, would entitle appellants to relief under the allegations in their complaints.

(Footnote omitted.) *See also Grimsby v. Samson,* 85 Wn.2d 52, 530 P.2d 291 (1975). Thus, we find the trial court erred in dismissing appellants' claim for negligent infliction of emotional distress.

Parenthetically, it should be noted that of late, criticism has been leveled against the public duty doctrine on the basis that it in fact reinstates the doctrine of sovereign immunity. *See Brennen v. Eugene,* 285 Or. 401, 591 P.2d 719 (1978); *Coffey v. Milwaukee,* 74 Wis. 2d 526, 247 N.W.2d 132 (1976).[6] *See also Riss v. New York,* 22 N.Y.2d

---

[6]*Adams v. State,* 555 P.2d 235 (Alaska 1976) is often cited for the proposition that the "duty to all, duty to no–one" doctrine is a form of sovereign immunity. Actually, the Alaska Supreme Court in *Adams* followed more of a rescue doctrine in holding that the State owed an actionable duty to abate known fire hazards in a hotel. The opinion is couched in terms of "voluntary assumption of a duty," rather than absolute duty. Moreover, that court specifically states:

> In reaching our decision we are not necessarily required to consider whether the state can be held liable for a negligent failure to *discover* fire hazards, as opposed to liability based upon its failure to abate such hazards after

579, 583, 240 N.E.2d 860, 293 N.Y.S.2d 897 (1968) (Keating, J., dissenting). That criticism is not well founded. Abrogation of the doctrine of sovereign immunity did not *create* duties where none existed before. It merely permitted suits against governmental entities that were previously immune from suit. Consequently, unless legislation or judicially created exceptions create a duty, where none existed before, liability will not attach.

### III

We also reverse the trial court's dismissal of appellants' second cause of action which alleges that respondents' outrageous conduct caused appellants to suffer severe emotional distress.

■ The claim for the tort of outrage (alternately known as intentional infliction of severe emotional distress) was improperly dismissed as a matter of law, for appellants alleged facts constituting a cause of action. To establish a claim for the tort of outrage appellants must demonstrate that (1) they suffered severe emotional distress; (2) the emotional distress was inflicted intentionally or recklessly, and not negligently; (3) the conduct complained of was outrageous and extreme; and (4) that they personally were either the object of the respondents' actions or an immediate family member present at the time of such conduct. *Grimsby v. Samson, supra,* at 59–60 (reversing a motion to dismiss where plaintiff alleged that the hospital and doctor acted negligently, recklessly, wantonly and outrageously in refusing to treat plaintiff's wife, thereby requiring plaintiff "to witness the terrifying agony and explicit pain and suffering of his wife while she proceeded to die right in front of his eyes", *Grimsby,* at 53). *See also Contreras v. Crown Zellerbach Corp.,* 88 Wn.2d 735, 565 P.2d 1173 (1977) (reversing the dismissal of an action for severe emotional distress resulting from the abusive racist conduct of the

---

discovery, since all of the hazards in the instant case were known to the inspectors.
*Adams,* at 240.

defendant's employees); *Phillips v. Hardwick,* 29 Wn. App. 382, 628 P.2d 506 (1981) (affirming the trial court's refusal to dismiss an action for outrage involving defendants' (the sellers) refusal to vacate the premises upon an agreed upon date and preventing the plaintiffs (the purchasers) from taking possession and moving in even after the house had been vacated).

Appellants specifically alleged respondents' actions "constitute[d] extreme and outrageous conduct which recklessly . . . caused severe emotional distress to Plaintiffs Jim Chambers–Castanes and Steve Ann Chambers–Castanes." The determination of whether such conduct is outrageous and reckless rests with the jury. *Contreras v. Crown Zellerbach Corp., supra* at 743–45 (Stafford, J., concurring). *See also Grimsby,* at 60.

In the instant case, appellants have not had the opportunity to present their case. Factual questions exist as to whether the police conduct was extreme and outrageous, and whether appellants suffered extreme emotional distress from such conduct. Certainly, the trial court may determine at the outset if reasonable minds could differ on whether the conduct has been sufficiently extreme and outrageous as to result in liability. *Phillips,* at 387. But, as long as appellants have stated a claim upon which relief can be granted, this determination must await presentation of the evidence. Thus, for purposes of a CR 12(b)(6) motion, appellants have sufficiently alleged a cause of action for the tort of outrage. The trial court erred in dismissing the claim.

## IV

■ We affirm the trial court's dismissal of appellants' third cause of action which alleges respondents' negligent performance of their duties caused appellants to lose any cause of action they might have had against their assailants. We have been provided with no authority and are aware of none supporting the proposition that in failing to arrest the assailants, respondents may be liable for causing appellants to lose any cause of action they might have had

against their assailants. Generally, an assignment of error unsupported by citation of authority will not be considered by the court. *Hamilton v. State Farm Ins. Co.*, 83 Wn.2d 787, 523 P.2d 193 (1974). The only authority of which we are aware is to the contrary. *See Falco v. New York*, 34 A.D.2d 673, 310 N.Y.S.2d 524 (1970), *aff'd*, 29 N.Y.2d 918, 279 N.E.2d 854, 329 N.Y.S.2d 97 (1972). Further, we note with interest that during oral argument appellants' lawyer conceded, for the purpose of this case, that there was no duty to make an arrest. This alone would destroy appellants' last claim.

The judgment of the trial court is reversed in part and affirmed in part.

WILLIAMS, C.J., and BRACHTENBACH, DOLLIVER, DORE, and PEARSON, JJ., concur.

UTTER, J. (concurring in the result)—I concur in the result reached by the majority. I would, however, reject the "public duty" doctrine embraced by the majority inasmuch as I believe respondents' duty toward appellants rests upon the traditional tort principles of policy and foreseeability rather than the existence of an ill–defined special relationship and reliance upon explicit assurances.

I

While a majority of jurisdictions still adhere to the rule that state and municipal laws generally impose only a duty owed to the public as a whole rather than particular citizens, the recent trend is toward rejection of this rule. *Wilson v. Nepstad*, 282 N.W.2d 664, 667 (Iowa 1979); *see, e.g.*, *Adams v. State*, 555 P.2d 235, 241–42 (Alaska 1976); *Ryan v. State*, 134 Ariz. 308, 656 P.2d 597, 599 (1982); *Martinez v. Lakewood*, 655 P.2d 1388, 1390 (Colo. Ct. App. 1982); *Commercial Carrier Corp. v. Indian River Cy.*, 371 So. 2d 1010, 1016 (Fla. 1979); *Stewart v. Schmieder*, 386 So. 2d 1351, 1356–58 (La. 1980); *Brennen v. Eugene*, 285 Or. 401, 411, 591 P.2d 719 (1979); *Coffey v. Milwaukee*, 74 Wis. 2d 526, 540, 247 N.W.2d 132 (1976). The majority's conclusory

dismissal of these cases is unpersuasive. They do not create duties where none existed before, as the majority claims. Majority, at 288. They simply analyze the duty question by applying traditional tort principles, analogizing where possible to the liability of private parties performing similar functions. *See, e.g., Adams,* at 241; *Ryan,* 656 P.2d at 599; *Wilson,* at 671–72; *Brennen,* at 406–14; *Coffey,* at 537–43. By rejecting this approach, the majority's analysis flies in the face of the Legislature's express direction that governmental entities shall be liable in tort "to the same extent as if they were a private person or corporation" (RCW 4.96-.010). This seems to me a rather flagrant exercise of judicial lawmaking in an area where the Legislature has already spoken.

The public duty doctrine is in reality merely a not so subtle and limited form of sovereign immunity. *Adams v. State, supra* at 241; Note, *State Tort Liability for Negligent Fire Inspection,* 13 Colum. J. L. & Soc. Probs. 303, 338 (1977) (hereinafter Columbia Note); 18 E. McQuillin, *Municipal Corporations* § 53.04(b) (3d ed. 1977) (prefacing discussion of public duty doctrine by the comment that even absent sovereign immunity "the tort liability of a public official is not in all circumstances identical with that of a private individual"). The rationales set forth in defense of the doctrine are (1) excessive governmental liability and (2) the need to prevent hindrance of the governing process. *Adams v. State, supra* at 242; Columbia Note, at 338, 344–45; *see, e.g., Massengill v. Yuma Cy.,* 104 Ariz. 518, 523, 456 P.2d 376 (1969); *Keane v. Chicago,* 98 Ill. App. 2d 460, 463, 240 N.E.2d 321 (1968); *Stranger v. New York Elec. & Gas Corp.,* 25 A.D.2d 169, 172, 268 N.Y.S.2d 214 (1966). These are precisely the justifications formerly provided for sovereign immunity. *See, e.g., Riddoch v. State,* 68 Wash. 329, 333, 123 P. 450 (1912); *Berek v. Metropolitan Dade Cy.,* 396 So. 2d 756, 758 (Fla. Dist. Ct. App. 1981); *Glassman v. Glassman,* 309 N.Y. 436, 440, 131 N.E.2d 721 (1956); Van Alstyne, *Governmental Tort Liability: A Public Policy Prospectus,* 10 U.C.L.A. L. Rev. 463, 467 (1963). They were

necessarily rejected by the legislative abolition of sovereign immunity and should therefore not be reinstated under the guise of the public duty doctrine.

Instead, governmental tort liability should be limited just as is that of private entities. Indeed, the wording of RCW 4.96.010, which I note above, mandates such an approach. Initially, the tort concept of duty, which turns on foreseeability and pertinent policy considerations, will provide significant protection. *See Brennen v. Eugene, supra* at 411–13. Secondly, the policy considerations implicit in the concept of proximate cause will reasonably limit liability. *See Coffey v. Milwaukee, supra* at 540–43. It may be noted that the sufficiency of these limitations is not merely a matter for conjecture since they have been regularly applied by this court in other actions against government entities. *See, e.g., Hansen v. Washington Natural Gas Co.,* 95 Wn.2d 773, 776–77, 632 P.2d 504 (1981) (lack of foreseeability); *LaPlante v. State,* 85 Wn.2d 154, 160, 531 P.2d 299 (1975) (no "but for" cause); *King v. Seattle,* 84 Wn.2d 239, 250–51, 525 P.2d 228 (1974) (no proximate cause). Moreover, governmental entities have the same option as private parties of spreading their losses through insurance. *Hunter v. North Mason High Sch.,* 85 Wn.2d 810, 817, 539 P.2d 845 (1975).

The decisions of this court cited by the majority in support of the public duty doctrine do not rely upon it and are not inconsistent with my analysis. *Baerlein v. State,* 92 Wn.2d 229, 595 P.2d 930 (1979) most closely approaches adoption of the public duty doctrine by asserting that it is the "traditional rule" and is "almost universally accepted". *Baerlein,* at 231. *Baerlein,* however, turned on the existence of a specific statutory disclaimer (*Baerlein,* at 232)[7] and its broader statements about the public duty doctrine were therefore unnecessary.

Neither do the other decisions cited by the majority

---

[7]This distinction was noted by the court in *Rogers v. Toppenish,* 23 Wn. App. 554, 561, 596 P.2d 1096 (1979).

adopt the public duty doctrine. In *Mason v. Bitton,* 85 Wn.2d 321, 534 P.2d 1360 (1975), we found no need to, and so did not, address the public duty doctrine because a duty was expressly created by statute. *Mason,* at 325–26. In *Halvorson v. Dahl,* 89 Wn.2d 673, 676, 574 P.2d 1190 (1978), we expressly declined to decide the vitality of the public duty doctrine in this state because the ordinance there at issue evidenced an intent to "identify and protect a particular and circumscribed class of persons." Similarly, in *Campbell v. Bellevue,* 85 Wn.2d 1, 9, 530 P.2d 234 (1975), we merely stated that "[w]e have no particular quarrel *at this time*" with the public duty doctrine and applied the recognized exception relied upon in the instant case by the majority. (Italics mine.) *See Campbell,* at 10–13.

The time has now come to quarrel with the doctrine directly and end its slow dismemberment by exception. The exceptions we have enunciated simply "reflect the tension which exists between the law abolishing sovereign immunity and the court rule which preserves it." *J & B Dev. Co. v. King Cy.,* 29 Wn. App. 942, 952, 631 P.2d 1002 (1981), *aff'd,* 100 Wn.2d 299, 669 P.2d 468 (1983). The Legislature's willingness to expose governmental entities to liability, shown by its repeal of the sovereign immunity laws, deprives the majority's framework of its only reason for being.

> Just as an individual can be killed by the government's negligent firing of a long–range ballistic missile, he similarly can be killed by a policeman's negligent discharge of a police pistol at point–blank range. Imposition of liability in the latter case and denial of relief in the former, assuming proof of negligence and of actual and proximate cause in both instances, can be rationally explained only by an improper, though perhaps understandable, fear of exposure to potentially greater liability. Legal, moral, or conceptual analyses compel the rejection of such a baseless dichotomy.

(Footnote omitted.) Columbia Note, at 330.

As most recently characterized by this court in *J & B Dev. Co. v. King Cy.,* 100 Wn.2d 299, 669 P.2d 468 (1983),

the public duty doctrine may have been reduced to a mere restatement as to public entities of the general rule that a duty toward the particular plaintiff must be shown. *See J & B Dev. Co. v. King Cy., supra* at 309 (Utter, J., concurring). If the doctrine is limited to this restatement, however, it should be eliminated as superfluous and unnecessarily confusing.

## II

RCW 36.28.010 gives the county sheriff a general duty to provide necessary police protection. *Cf. Walters v. Hampton,* 14 Wn. App. 548, 551, 543 P.2d 648 (1975) (such duty imposed on city police department by RCW 35.24.160). This alone does not give rise to a duty toward appellants, however—such a specific duty arose only if the risk of harm which befell appellants was a reasonably foreseeable result of respondents' failure to act. *See, e.g., King v. Seattle, supra* at 248.

In the instant case the harm was reasonably foreseeable. This was not an instance of a single call which did not indicate the emergency nature of the situation. Rather, appellants made repeated calls and, at least during the later calls, were clearly upset. Under these circumstances, it was reasonably foreseeable that appellants would suffer emotional distress.

The second element of negligence is breach of the duty owed the plaintiff. *LaPlante v. State, supra* at 159. It is conceded here that respondents failed to respond to appellants' calls—they thus breached their duty toward appellants.

The final element of negligence is that the alleged breach of duty be a proximate cause of resulting injury. *LaPlante,* at 159. Proximate cause depends both on the existence of cause in fact and "whether, as a policy of law, legal liability should attach". *King v. Seattle, supra* at 250. In addition, the causal connection between a breach of duty and a plaintiff's injury must not be broken by an intervening event which is not reasonably foreseeable. *Maltman v.*

*Sauer,* 84 Wn.2d 975, 982, 530 P.2d 254 (1975).

In the present case, respondents' failure to act was a cause in fact of appellants' emotional distress. In addition, there appears to be no intervening event sufficient to break that chain of causation. Finally, I find no policy reason why, under the facts as alleged, liability should not attach. Absent a reasonable belief that the police were on their way, appellants' failure to attempt a citizen's arrest might,[8] as a policy of law, negate proximate causation. *Cf. King v. Seattle, supra* at 250–51 (plaintiffs' failure to attempt to avoid damages precluded liability). In light of the assurances respondents gave appellants and appellants' reliance thereon, however, proximate cause of appellants' emotional distress does exist here.

Respondents' failure to act was not, however, a proximate cause of appellants' alleged loss of a cause of action. Appellants conceded at oral argument that the police, had they arrived, would have had no duty to make an arrest. *Cf. Walters v. Hampton, supra* at 552–53 (police have discretion in use of arrest and criminal process). Yet it was the failure of arrest, not the failure to arrive, that was a cause in fact of appellants' loss of any cause of action. Even had there been a duty to arrest, and hence cause in fact, I would hold that the chain of causation was, as a matter of policy, too attenuated to establish proximate cause. *See Walters,* at 555–56.

I would reverse in part and affirm in part as has the majority. I would permanently inter the public duty doctrine, however, rather than attack it piecemeal as have our decisions to date.

DIMMICK, J. (concurring in part, dissenting in part)—I concur with the majority that appellants should be allowed to attempt to prove intentional infliction of severe emotional distress. However, notwithstanding sympathy for the

---

[8] An important factor in making this determination would be the risk which might be involved in making such an arrest.

appellants who were victims of senseless criminal acts, I would not allow their cause of action for negligent infliction of emotional distress.

It is easy to condemn the police dispatchers in the instant case. However, the desire for condemnation cannot satisfy the need for a special relationship out of which a duty normally owed to the general public becomes a duty owed to a specific person.

As recognized by the majority, the general duty owed to the public by police may become a specific duty to an individual if the police and the individual are in a special relationship. Thus, when the New York Police Department solicited confidential information to aid in the apprehension of a known gangster, the police assumed a special duty to the informant who came forward. *Schuster v. New York,* 5 N.Y.2d 75, 154 N.E.2d 534, 180 N.Y.S.2d 265 (1958). Similarly, a special relationship was created when the police arranged a confrontation between a suspect and a witness to a crime, thereby giving the suspect an opportunity to assault the witness. *Gardner v. Chicago Ridge,* 71 Ill. App. 2d 373, 219 N.E.2d 147 (1966). When a police officer investigating a traffic accident led plaintiff into the middle of the highway and plaintiff was struck by another car, the court held a special relationship was created by the officer's affirmative conduct. *McCorkle v. Los Angeles,* 70 Cal. 2d 252, 449 P.2d 453, 74 Cal. Rptr. 389 (1969).

Appellants contend and the majority agrees that they fall within this category of persons having a special relationship with the police due to their calls requesting assistance and the assurances made by the dispatchers upon which they relied. The majority concludes that the set of facts alleged constitutes the privity between appellants and the police and the reliance necessary for a cause of action. I do not agree that the facts alleged rise to the level necessary to establish privity in the instant case.

Courts which have had the opportunity to consider comparable situations have concluded that a request for aid and resulting assurances are not in themselves sufficient to

create a special duty. Recently, in *Warren v. District of Columbia*, 444 A.2d 1 (D.C. 1981) (relied upon but rejected by the majority at page 286, footnote 5 as being too restrictive), the court held that the following facts did not give rise to a special relationship and dismissed the complaint: Plaintiffs heard intruders enter their rooming house and heard one of their housemates in a room downstairs scream as she was being raped. Plaintiffs called the police who responded by making a perfunctory check of the exterior of the building. Plaintiffs again heard their housemate's screams and called the police. A police officer assured them help was on the way but the call was never dispatched. Thinking the police had arrived, plaintiffs called to their housemate thus alerting the intruders to their presence. Plaintiffs were then taken from their residence, held hostage, raped and brutalized for 14 hours. The court in dismissing the causes of action for negligence reviewed the development of the special duty doctrine in other jurisdictions and determined the facts before it did not rise to the level of a special relationship. In dismissing the complaint, the court stated:

> Our representative form of government is replete with duties owed to everyone in their capacity as citizens but not enforceable by anyone in his capacity as an individual. Through its representatives, the public creates community service; through its representatives, the public establishes the standards which it demands of its employees in carrying out those services and through its representatives, the public can most effectively enforce adherence to those standards of competence. . . .
>
> Plaintiffs in this action would have the Court and a jury of twelve additional community representatives join in the responsibility of judging the adequacy of a public employee's performance in office. Plaintiffs' proposition would lead to results which [another court] aptly described as "staggering."

*Warren*, at 8.

In California, a plaintiff arranged to have its burglar alarm directly wired to the police station. Plaintiff con-

tended that the alarm went off during the course of a burglary but the police dispatcher negligently delayed 10 minutes before transmitting the alert, thereby allowing the burglars to escape with the plaintiff's goods. Plaintiff argued that the alarm hookup created a special relationship with the police but the court rejected this contention, concluding that "[a]n alert from an alarm, irrespective of how transmitted, is no more than a complaint that a crime has been or is being committed." *Antique Arts Corp. v. Torrance,* 39 Cal. App. 3d 588, 592, 114 Cal. Rptr. 332, 334 (1974).

A Florida court dismissed a complaint against a city based on alleged negligence of its police officers notwithstanding plaintiff's having requested and specifically discussed plans for police protection. *Henderson v. St. Petersburg,* 247 So. 2d 23 (Fla. Dist. Ct. App. 1971). After reviewing cases in which police or other government agencies were under a "special duty" different from that owed to the public generally, the Florida court concluded that a request for police protection, even when accompanied by a promise that protection would be provided, does not create the "special duty" necessary to establish tort liability. *Henderson,* at 25.

I find the reasoning and holdings of those cases to be persuasive. I cannot find that a special relationship exists in this case. The instant case is distinguishable from *J & B Dev. Co. v. King Cy.,* 100 Wn.2d 299, 669 P.2d 468 (1983), wherein we found a special relationship existed between a developer and the officials issuing an incorrect building permit. In that case there was face-to-face contact with the officials who issued the incorrect permit and gave inaccurate information. The permit was issued after these officials inspected maps, records, and the property, and after they should have checked the applicable codes. This direct contact and assurance (issuance of the permit) constituted a special relationship. The facts of the instant case do not rise to such a level, especially in light of the fact that the injuries occurred before the police were ever called.

In adopting the "public duty" doctrine which is tempered by the "special relationship" rule, we must be wary that we do not make every duty owed to the public a duty owed to an individual. Otherwise the standard rationales for the public duty doctrine will be meaningless and the doctrine obviated. There is, of course, an obligation for public employees to perform their duties fully and adequately. The police owe the public the duty to respond to calls in order to provide police protection. The police conduct here clearly was far from commendable. However, the facts alleged here do not establish a relationship between the police and appellants different from that existing between police and citizens generally.

Accordingly, I would dismiss the complaint's allegation of negligent infliction of emotional distress.

ROSELLINI, J., concurs with DIMMICK, J.