# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ESTHER KIM, as Personal Representative of the Estate of HO JM BAE on behalf of Mi-Soon Kim, Jae C. Kim, Chang Soon Kim, Jae Hong Kim, and Kyoung Soon Kim, surviving family members, and the ESTATE OF HO IM BAE, | ) ) ) ) ) ) ) ) ) | No. 70892-9-I

DIVISION ONE

PUBLISHED OPINION |
| Appellants/Cross-Respondents, | ) ) | |
| v. | ) ) | |
| LAKESIDE ADULT FAMILY HOME, GRETCHEN DHALIWAL INCORPORATION (G.D., INC.), a Washington Corporation d/b/a LAKESIDE AFH, GRETCHEN DHALIWAL, individually, | ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| ALPHA NURSING AND SERVICES INCORPORATED, a Washington Corporation; | ) ) ) ) | |
| Respondent, | ) ) | |
| CHRISTINE THOMAS, individually, | ) ) | |
| Respondent/Cross-Appellant, | ) ) | |
| and | ) ) | |
| "JANE AND JOHN DOES" I-V, individually, | ) ) ) | |
| Defendants. | ) ) | FILED: February 17, 2015 |

TRICKEY, J. — The Washington vulnerable adult protection act, chapter 74.34 RCW, requires mandated reporters to notify the Department of Social and Health Services (DSHS) where there is "reasonable cause to believe" that abuse has occurred. RCW 74.34.035. The act also requires a report to law enforcement

when one has "reason to suspect" that a physical assault has taken place. RCW 74.34.035. Here, the defendant, a nurse, informed DSHS about a report that she had received regarding potential abuse at the adult family home. There was no duty to call law enforcement about someone else's patient when the information came from a person with whom the defendant was familiar and whose reliability was questionable.

Nor did the plaintiff establish that a second nurse had a duty to call authorities when she observed the patient back in bed, with her eyes open, and able to move her legs, after a fall on the floor the day before.

Because the plaintiff has failed to establish any duty, a necessary element of a negligence action, summary judgment dismissal was appropriate.

We affirm the trial court.

## FACTS

Ho Im Bae (Bae) was one of four inpatient residents at Lakeside Adult Family Home (Lakeside). Lakeside was owned and operated by Gretchen Dhaliwal, Inc.

Bae was admitted to Lakeside on January 23, 2009, suffering from Parkinson's, arthritis, dementia, hypertension, hyperlipidemia, and spinal stenosis. She died less than three months later on March 30 from acute morphine intoxication. Morphine was not a prescribed drug for Bae. Her death was ruled a homicide.

Lakeside employed Fannie Irawati as a caregiver for Bae during this time. Two employees of Alpha Nursing and Services, Inc. (Alpha), Christine Thomas, Registered Nurse (RN), and Marian Binondo, Licensed Practical Nurse (LPN),

2

provided nursing care to two of the four residents at Lakeside, but did not provide nursing services for Bae. Binondo filled in for the regularly assigned Thomas on weekends and vacation days in March 2009.[1]

Binondo was in the kitchen at Lakeside with Kerri Salzbrun, her patient, when she heard a "thud" from the adjacent room. Salzbrun entered the adjacent room and Binondo followed. Binondo saw Bae lying on the floor near her bed. Binondo told Irawati that Irawati might need to call 911 and that Bae might need further assessment by her nurse. Irawati returned Bae to her bed and told Binondo that Bae falls a lot, but that she would call Dhaliwal, an RN and the owner of Lakeside, who lived across the street from the home. Binondo saw that Bae's eyes were open and she was able to move her legs. She did not observe any bruising at the time. As she left the facility, Binondo saw Irawati on the telephone.

Salzbrun asserted in her declaration that she observed a knot on Bae's head. Over the next day or two, the knot appeared larger and Bae's face was covered in a large bruise.

On March 30, the morning of Bae's death, Thomas resumed her regular rounds at Lakeside, visiting her patients. Salzbrun told Thomas that Bae was being given morphine. Thomas checked the medical records located in the kitchen. From there, she saw Bae, unable to walk, being taken to the bathroom to be washed. Irawati "held her under her arms and walked backwards pulling her

---

[1] There appears to be a discrepancy on the date of the fall with Kim stating it occurred on March 28 and Alpha contending March 21. Appellant's Br. at 5; Resp't's Br. at 6-7. The respondent's brief indicates late March, but cites to an assessment by Lakeside's owner occurring on March 21. 1 Clerk's Papers (CP) at 844. Binondo's time sheet does not have the patient written in for the March 21 date, but does for the March 28 and 29 dates. 3 CP at 972. Binondo's deposition shows her agreeing with counsel that the date could be March 28 as does Kerri Salzbrun's declaration. 1 CP at 123, 127, 328-29.

while her feet were sliding on the floor."[2] Thomas did not observe any bruising or injuries.

Shortly after leaving Lakeside, at approximately 10:00 a.m., concerned about the allegation of morphine, Thomas called the DSHS Complaint Resolution Unit (1-800-END-HARM hotline) to report her observations and the concerns Salzbrun had expressed to her about Bae. The phone was busy. She called again at 11:30 a.m. and left a voice mail message as instructed.

That same night, Salzbrun found Bae unresponsive and called 911. Bae's death from acute morphine intoxication was subsequently ruled a homicide.

On April 1, both Binondo and Thomas were at Alpha's office. Thomas related her concerns about Bae to Binondo. Binondo, recalling the fall that had occurred when she was there, thought the patient might well have been the same one. The supervisor recommended that Binondo report the incident to DSHS in light of Thomas's recent information. Binondo placed a call and left a voice mail message describing her observations.

Esther Kim as Personal Representative of Bae's estate brought this civil action for damages against Lakeside and Dhaliwal. In 2012, she added Alpha and Thomas asserting a claim for negligence for failure to report Bae's abuse under Washington's vulnerable adult protection act, chapter 74.34 RCW.

The parties stipulated to dismissal of all claims against Lakeside, and Dhaliwal individually. Thomas moved to dismiss the action against her for improper service. Alpha moved to dismiss the action on summary judgment. The trial court ruled service on Thomas was timely and proper and later dismissed the

---

[2] 1 CP at 178.

suit on summary judgment. The trial court also denied Kim's motion for reconsideration. Kim appeals the summary judgment dismissal of her action. Thomas cross-appeals the trial court's ruling that service on her in Norway was proper.

## ANALYSIS

### I. Service on Thomas

Thomas first contends the trial court erred in not dismissing the action against her because such service was untimely. Service on one of two or more co-defendants tolls the statutes of limitations as to unserved defendants. Powers v. W.B. Mobile Servs., Inc., __ Wn.2d __, 339 P.3d 173, 176 (2014); RCW 4.16.170. There is no dispute that Alpha, the co-defendant, was timely served. Thus, service on Thomas was timely.

Thomas next argues that service was invalid because it failed to comply with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, T.I.A.S. No. 6638, 20. U.S.T. 361 (hereinafter Hague Convention). Because Thomas was a Norwegian citizen, living in Norway at the time of service, Kim was obligated to serve her under the requirements of the Hague Convention.

Under the supremacy clause, United States Constitution, article VI, the "Hague Convention preempts inconsistent methods of service prescribed by state law in all cases to which [t]he Hague Convention applies." Broad v. Mannesmann Anlagenbau, A.G., 141 Wn.2d 670, 674-75, 10 P.3d 371 (2000). Article 1 of the Hague Convention provides that it applies "'in all cases, in civil or commercial

matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad.'" Broad, 141 Wn.2d at 678 (quoting Hague Convention, art. 1).

The Hague Convention specifies that "the Central Authority of the State addressed shall itself serve the document or shall arrange to have it served by an appropriate agency . . . by a method prescribed by its internal law for the service of documents in domestic actions upon persons who are within its territory." Hague Convention, art. 4(a). Thus, service on Thomas would be effective if it was accomplished in accordance with Norwegian law.

Further, the Hague Convention "allows service to be effected without utilizing the Central Authority as long as the nation receiving service has not objected to the method used." DeJames v. Magnificence Carriers, Inc., 654 F.2d 280, 288 (3rd Cir. 1981); see also RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 471 cmt. e (1987) ("for states that have objected to all of the alternative methods, service through the Central Authority is in effect the exclusive means").

Here, Kim personally served Thomas. The record contains the affidavit of Thomas's process server, in which the process server swore that he personally served Thomas at her residence, which is considered due and proper service under the laws of Norway. Because Norway has not objected to personal service and, in fact, such service complied with its laws, there is no reason to invalidate service in this case.

Furthermore, such service was proper and accomplished in accordance with the superior court's civil rules of procedure in Washington State. CR 4(i)(1) provides for "Alternative Provisions for Service in a Foreign Country":

> *Manner.* When a statute or rule authorizes service upon a party not an inhabitant of or found within the state, and service is to be effected upon the party in a foreign country, it is also sufficient if service of the summons and complaint is made: (A) in the manner prescribed by the law of the foreign country for service in that country in an action in any of its courts of general jurisdiction; or (B) as directed by the foreign authority in response to a letter rogatory or a letter of request; or (C) upon an individual, by delivery to him personally, and upon a corporation or partnership or association, by delivery to an officer, a managing or general agent; or (D) by any form of mail, requiring a signed receipt, to be addressed and mailed to the party to be served; or (E) pursuant to the means and terms of any applicable treaty or convention; or (F) by diplomatic or consular officers when authorized by the United States Department of State; or (G) as directed by order of the court. Service under (C) or (G) above may be made by any person who is not a party and is not less than 21 years of age or who is designated by order of the court or by the foreign court. The method for service of process in a foreign country must comply with applicable treaties, if any, and must be reasonably calculated, under all the circumstances, to give actual notice.

Here, the service complied with both the Hague Convention and CR 4(i)(1), giving Thomas actual notice.

Because we hold that service was effective, we need not address whether Thomas waived her affirmative defense objection to such service of process.

## II. Summary Judgment

### Standard of Review

A motion for summary judgment may be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). When a defendant moves for summary judgment, it bears the initial burden of showing the absence of an issue of material fact. Young v. Key Pharm., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). The burden then moves to the plaintiff to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden

of proof at trial." Young, 112 Wn.2d at 225 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In meeting his burden, the plaintiff cannot rely solely on allegations made in his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. Young, 112 Wn.2d at 225-26. If the plaintiff does not meet his burden, "'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" Young, 112 Wn.2d at 225 (internal quotation marks omitted) (quoting Celotex Corp., 477 U.S. at 322-23).

This court reviews summary judgment orders de novo, viewing the facts and reasonable inferences in the light most favorable to the nonmoving party. Lowman v. Wilbur, 178 Wn.2d 165, 168-69, 309 P.3d 387 (2013). Issues of negligence and causation in tort actions are questions of fact not usually susceptible to summary judgment, but a question of fact may be determined as a matter of law where reasonable minds can reach only one conclusion. Moore v. Hagge, 158 Wn. App. 137, 147-48, 241 P.3d 787 (2010).

The elements of a negligence claim are (1) a legal duty owed by the defendant to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff proximately caused by the breach, and (4) damages. Schooley v. Pinch's Deli Mkt., Inc., 134 Wn.2d 468, 951 P.2d 749 (1998). All four must be present to establish a claim.

Legal Duty

Kim argues that Binondo and Thomas failed to report suspected abuse to the appropriate governmental agency. She argues that both had a mandatory duty

to report the abuse and that their failure to do so constituted neglect under RCW 74.34.020(12).

RCW 74.34.020(12) defines neglect as follows:

"Neglect" means (a) a pattern of conduct or inaction by a person or entity with a duty of care that fails to provide the goods and services that maintain physical or mental health of a vulnerable adult, or that fails to avoid or prevent physical or mental harm or pain to a vulnerable adult; or (b) <u>an act or omission by a person or entity with a duty of care that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health</u>, welfare, or safety, including but not limited to conduct prohibited under RCW 9A.42.100.

(Emphasis added.) To establish neglect, then Kim must demonstrate that Alpha had a duty to report.

We agree that both Binondo and Thomas were mandatory reporters under the act:

"Mandated reporter" is an employee of the department; law enforcement officer; social worker; professional school personnel; individual provider; an employee of a facility; an operator of a facility; <u>an employee of a social service, welfare, mental health, adult day health, adult day care, home health, home care, or hospice agency;</u> county coroner or medical examiner; Christian Science practitioner; or health care provider subject to chapter 18.130 RCW.

RCW 74.34.020(11) (emphasis added).

Both employees of Alpha fall within that definition as they are clearly employees of an agency that provides health care. The act does not limit a reporter to only those who provide services to a specific patient.

Kim argues that the statute creates an implied statutory cause against mandatory reporters who violate their reporting duties. Alpha argues that even if the employees are mandated reporters, Binondo was not required to make an

immediate report because she did not observe any abuse; and Thomas did, in fact, report the suspected abuse to DSHS almost immediately after learning about it. Thus, neither breached their duty.

Binondo

Binondo's declaration states:

> 4.     In mid-March. I made a nursing visit to one of Alpha's patient's at the Lakeside Adult Family Home because Christine Thomas, RN was off-duty. During my visit, at one point I was in the kitchen with my patient, when we both heard a "thud" in the adjacent room. My patient left the kitchen and entered the adjacent room where the "thud" had originated. I then followed my patient, and entered the room. A caregiver who I knew as "Fannie" entered the room at about that time. The room was a resident's bedroom, but I did not know the resident's name and I had never seen her prior to that date, as she was not a patient of Alpha.
>
> 5.     When I entered the room, I saw a small elderly Asian woman, lying on floor near her bed. Aside from that woman, Fannie, myself and my patient, there was no one else in the room. I told Fannie that she might need to call 911 and would probably need further assessment by her nurse. I did not know the resident's history, or health and mental status because she was not my patient.
>
> 6.     Fannie told me that the resident "falls a lot." Fanny told me that she would call the owner of Lakeside Adult Family Home, Ms. Gretchen Dhaliwal, R.N., who lives just across the street from the home, and report the fall. It did not appear to me that the resident was injured in the un-witnessed fall. I did not witness any abuse of the resident. The resident did not seem to be in distress once she was placed in bed, and was moving her extremities without difficulty. I knew that Ms. Dhaliwal was the home's primary nurse, and concluded, based on Fanny's statement, that Ms. Dhaliwal would perform an assessment of the resident's condition. As I departed the home, I saw Fannie dialing the phone.[3]

The declaration further states that on the morning after Bae died, Binondo learned of Thomas's observations. Suspecting the patient might be the same one, she

---

[3] 2 CP at 655-56, 758-59.

reported her observations to her supervisor and then to the DSHS hotline on April 1, 2009.

Under the statute, Binondo met her mandatory reporting requirement. She did not learn of any possible abuse until she became aware of Thomas's experience the day following her observations. Without more, no reasonable person would assume that Binondo had an obligation to report her initial observations to DSHS or law enforcement at the time she observed Bae fallen by her bed.

Thomas

On March 30, Thomas visited her patients at Lakeside. Salzburn told Thomas that Bae was being given morphine and sedated all the time. Thomas checked the book listing the patients' drugs and learned that morphine was not a prescribed drug for Bae.

Thomas was aware that, as a nurse, she was a mandatory reporter. Indeed upon leaving the home, Thomas immediately called DSHS but received a busy signal. At the next opportunity, one and half hours later, she called and reported the possibility of suspected abuse to DSHS:

> I work as a visiting nurse for Alpha Nursing in Snohomish and I worked in an AFH [(Adult Family Home)] today, Lakeside AFH, 16011 Eastshort Dr., Lynnwood, WA 98037. I have a patient there, Carrie Salsbrun [(CS)]. She was telling me about thing [sic] she was concerned about, that she had seen with another resident in the home, so it wasn't me observing, it was kind of a second hand report here.
>
> CS was saying she believed that one of the staff members had sedated one of the residents and that she observed two purple morphine tablets sitting in a cup next to her bed. The person does not have an order for morphine and she said the resident was totally sedated, she wasn't able to wake up and eat all day. I think she was referring to yesterday. CS also said she has seen some old med

11

sheets of some morphine in the closet. CS has a history of drug abuse. She is on narcotic medication so I can't say for sure that she's a reliable source. I thought it was rather concerning. She said she would call this in.

When I was at the home today, the patient that CS thought was over medicated was very drowsy. She kind of had to be dragged to the bathroom. She wasn't able to walk to the bathroom. The caregiver pulled her to the bathroom, sat her down to wash her and clean her. Of course, I don't work with the patient so I don't know what was going on. The patient is one of two Korean ladies that live in the home. She's the smallest of the two.

Like I said, CS is the one who reported this to me so she can give further details. The owner of the AFH is Gretchen and she is not in the home. The caregiver that CS said did this, her name . . . it just slipped my mind. She said it was the Asian lady who was working in the home today.

CALLED THE COMPL 3/30/09:

The Compl did not know the name of the resident effected. The Compl said Carrie Salsbrun may know but could not pronounce the name, as it was Korean.[4]

That report relayed her observations and the fact that it was based in part on information provided to her by a patient whom she could not say was reliable. Thus, under the provisions of the act, Thomas met her mandatory reporting duty.

Kim contends that although Thomas reported the suspicion of abuse to DSHS, she failed to report the abuse to a law enforcement agency. RCW 74.34.020(2) defines abuse as

"Abuse" means the willful action or inaction that inflicts injury, unreasonable confinement, intimidation, or punishment on a vulnerable adult. In instances of abuse of a vulnerable adult who is unable to express or demonstrate physical harm, pain, or mental anguish, the abuse is presumed to cause physical harm, pain, or mental anguish. Abuse includes sexual abuse, mental abuse,

---

[4] 3 CP at 999.

physical abuse, and exploitation of a vulnerable adult, which have the following meanings:

. . . .

(b) "Physical abuse" means the willful action of inflicting bodily injury or physical mistreatment. Physical abuse includes, but is not limited to, striking with or without an object, slapping, pinching, choking, kicking, shoving, prodding, or the use of chemical restraints or physical restraints unless the restraints are consistent with licensing requirements, and includes restraints that are otherwise being used inappropriately.

RCW 74.34.035(1) provides that "[w]hen there is reasonable cause to believe that abandonment, abuse, financial exploitation, or neglect of a vulnerable adult has occurred, mandated reporters shall immediately report to the department."[5]

RCW 74.34.035(3) provides that "[w]hen there is reason to suspect that physical assault has occurred or there is reasonable cause to believe that an act has caused fear of imminent harm," mandated reporters are required to immediately report to the department and to the appropriate law enforcement agency.[6]

RCW 74.34.035(3) imposes an additional requirement to report to law enforcement. In analyzing whether Thomas had a "reason to suspect" a "physical assault" had occurred, it is helpful to compare the language of subsection (1) with subsection (3). A "reason to suspect an assault" mandating a report to law

_____

[5] (Emphasis added.) Although this statute does not define the term "reasonable cause to believe" that term was recently defined by the legislature in 2013 in chapter 26.44 RCW, a statute dealing with child abuse and neglect. "Reasonable cause" means a person witnesses or receives a credible written or oral report alleging abuse, including sexual contact, or neglect of a child." RCW 26.44.030(b)(iii). That definition lends support to our holding here that Thomas, because her report to DSHS clearly stated that it was based on information provided to her by a patient whom she did not deem reliable, did not receive a "credible" oral report alleging abuse.

[6] RCW 74.34.035(3)(a),(b) (emphasis added).

enforcement must require a higher showing that a mere "reasonable cause to believe" that abuse has occurred which does not require a report to law enforcement. "When the legislature uses two different terms in the same statute, courts presume the legislature intends the terms to have different meanings." Densley v. Dep't of Ret. Sys., 162 Wn.2d 210, 219, 173 P.3d 885 (2007).

Thomas did not observe the event later determined to be an assault.[7] She only had the suspicions expressed by patient Salzbrun. Alpha established that Thomas had insufficient reason to believe that Salzbrun, under the influence of narcotics, was a reliable witness. Thomas had a relationship with Salzbrun and she had concerns about that Salzbrun's credibility. In her initial report to DSHS, Thomas's message clearly indicated that she did not think Salzbrun was reliable.

Kim fails to counteract this evidence of unreliability. The fact that Bae was murdered by an overdose of morphine became known after the fact. Thomas did not witness the caregiver administering any morphine, or any other medication for that matter.

Thomas observed a non-ambulatory patient being taken to the bathroom to be cleaned. This is characterized as being "dragged" to the bathroom.[8] Thomas's deposition clearly showed that she observed Bae as having a decreased level of consciousness, which is consistent with several health factors. She only notified DSHS of a potential problem. In fact, DSHS assessed the report as not needing review for 10 days.

---

[7] RCW 74.34.035(5) provides that when there is "reason to suspect" that the death of a vulnerable adult was caused by abuse or neglect, mandated reporters shall report the death to the medical examiner as well as the department and law enforcement as expeditiously as possible.

[8] 3 CP at 999.

Salzbrun's declaration in response to the motion for summary judgment merely states that she told Thomas that Bae was given someone else's morphine and was "doped up."[9] Salzbrun does not state how she knew this or on what basis she reached that conclusion, other than she saw two blue pills. All Thomas knew was that Salzbrun, a person whom Thomas felt to be less than reliable, declared that Bae was being given morphine.

Kim presented evidence of bruising being present at the time of the autopsy. However, neither Binondo nor Thomas saw any evidence of such bruising or injuries. Salzbrun testified that there was a knot when Bae fell, but that bruising developed later. But bruises in and of themselves would not have mandated a law enforcement call. Such bruises could be reasonably explained to be a result of the fall.

The basis of the abuse was asserted by another patient—a patient who was under narcotics and whose reliability was questioned by both her caregivers. While the suspicions espoused by the other patient may have raised a concern, that concern was passed to DSHS when Thomas made her call. Taking all the evidence in favor of Kim, there simply was not enough evidence of a physical assault to "mandate" Thomas calling law enforcement in these circumstances.[10]

Voluntary Rescue Doctrine

Finally, Kim argues that Alpha owed a duty of care under the voluntary rescue doctrine. Where the existence of a legal duty is dependent on disputed

---

[9] 1 CP at 124.
[10] Given our conclusion that no duty was breached under the circumstances of this case, we do not reach the issue of whether a breach of a mandatory duty to report under chapter 74.34 RCW would give rise to an implied cause of action.

material facts, summary judgment is inappropriate. Mita v. Guardsmark, LLC, 182 Wn. App. 76, 328 P.3d 962 (2014). Under this doctrine, a person owes a duty to one that he or she knows is in need if "(1) the actor voluntarily promises to aid or warn the person in need and (2) the person in need reasonably relies on the promise or a third person who reasonably relies on the promise." Mita, 182 Wn. App. at 85.

> The person in need may reasonably rely on the promise if it induces him or her to "refrain from seeking help elsewhere." Folsom [v. Burger King, 135 Wn.2d 658, 676, 958 P.2d 301(1998)]; Brown [v. MacPherson's, Inc., 86 Wn.2d 293, 300, 545 P.2d 13 (1975)]. The person in need may reasonably rely on the third person if "privity of reliance" exists between them. Osborn [v. Mason County, 157 Wn.2d 18, 26, 134 P.3d 197 (2006)]. The third person, in turn, may reasonably rely on the promise if it induces him or her to "refrain[ ] from acting on . . . behalf" of the person in need. Chambers-Castanes [v. King County, 100 Wn.2d 275, 285 n.3, 669 P.2d 451 (1983); accord Brown, 86 Wn.2d at 299-300. "[Either] person may reasonably rely on explicit or implicit assurances." Osborn, 157 Wn.2d at 26; Brown, 86 Wn.2d at 301.

Mita, 182 Wn. App. at 85 (alteration in original). Kim argues that Salzbrun took no action because she relied upon both Binondo and Thomas to take care of the problem. Salzbrun's declaration states:

> I thought [Binondo] was going to get help, but none arrived. . . .

> . . . I thought Nurse Thomas would leave and call for help, but no help arrived.[11]

Salzbrun's declaration does not assert that either nurse promised to make a call, rather she states that she "thought" either one of them would do something. This is insufficient to create a duty under the rescue doctrine.

---

[11] 1 CP at 124.

## CONCLUSION

We hold that Thomas was properly and timely served in accordance with the superior court's civil rules, Norway's rules on service of process, and the Hague Convention. Binondo had no duty to report to either DSHS or law enforcement. Likewise, under the circumstances present here, Thomas did not have a duty to report to law enforcement. We affirm the trial court's summary judgment dismissal. Neither party is entitled to attorney fees.

Trickey, J

WE CONCUR:

17