[No. 85658-3.   En Banc.]
Argued March 15, 2012.      Decided January 31, 2013.

ELSA ROBB, *as Personal Representative, Respondent*, v. THE
CITY OF SEATTLE ET AL., *Petitioners*.

428

*Peter S. Holmes, City Attorney*, and *Rebecca Boatright, Assistant*, for petitioners.

*Timothy G. Leyh, Matthew R. Kenney*, and *Elizabeth W. Perka* (of *Calfo Harrigan Leyh & Eakes LLP*), for respondent.

*Deborah A. Boe*, *Leo E. Poort*, and *Zanetta L. Fontes* on behalf of Washington Association of Sheriffs and Police Chiefs, amicus curiae.

*Milton G. Rowland* and *Daniel B. Heid* on behalf of Association of Washington Cities and Washington State Association of Municipal Attorneys, amici curiae.

*Michael P. Lynch* and *Catherine Hendricks* on behalf of Attorney General of Washington, amicus curiae.

*Franklin W. Shoichet* and *Fred Diamondstone* on behalf of Families and Friends of Violent Crime Victims, amicus curiae.

*Bryan P. Harnetiaux* and *George M. Ahrend* on behalf of Washington State Association for Justice Foundation, amicus curiae.

¶1 MADSEN, C.J. — The city of Seattle and Officers Kevin McDaniel and Pohna Lim (collectively City of Seattle or the city) challenge the Court of Appeals' decision affirming the trial court's denial of its motion for summary judgment. Respondent Elsa Robb, on behalf of her deceased husband Michael Robb, alleges that law enforcement acted negligently by failing to pick up and remove shotgun shells lying near Samson Berhe after stopping him on suspicion of burglary. After the stop, Berhe returned to retrieve the cartridges and shortly thereafter used one of them to kill Michael Robb. Respondent relies on *Restatement (Second) of Torts* § 302B comment e (1965) to argue law enforcement assumed a duty to Michael Robb by taking affirmative action that "created or exposed [Michael Robb] to a recognizable high degree of ... harm ... which a reasonable man would take into account." The City of Seattle contends that § 302B does not create a tort duty absent a special relationship and that it owed no duty to Michael Robb.

¶2 We hold that *Restatement* § 302B may create an independent duty to protect against the criminal acts of a third party where the actor's own affirmative act creates or exposes another to the recognizable high degree of risk of

harm. However, we also hold that here, the police officers' failure to pick up shotgun shells lying near defendants in a *Terry*[1] stop was not an affirmative act as contemplated by the *Restatement*. We reverse the Court of Appeals.

## FACTS AND PROCEDURAL HISTORY

¶3 On June 26, 2005, Berhe shot Michael Robb using a stolen shotgun loaded with two shells. Less than two hours before the shooting, Officers McDaniel and Lim stopped Berhe and his companion, Raymond Valencia, on suspicion of burglary two blocks from where Berhe lived. A neighbor reported that he saw Valencia throw several shells to the ground before the officers took control of Berhe and Valencia. During the stop, the officers observed three to five shotgun shells on the ground, but they neither questioned Berhe or Valencia about the shells nor picked them up. The officers explain that this decision was based upon the lack of a connection between the shells and the reported crime that led to the stop. Elsa Robb claims it was negligent for Officers McDaniel and Lim to fail to retrieve the shotgun shells.

¶4 After about 20 minutes of investigation, the officers released Berhe because he did not have any stolen property on him and they had no probable cause to arrest him in connection with burglary or any other crime. Berhe walked away, mumbling to himself. Minutes later, according to a witness, Berhe returned to the scene, picked something up from the ground (likely the shotgun shells), and soon thereafter shot and killed Michael Robb. Shortly before the shooting, Berhe came to the house of a neighbor, in possession of some yellow shotgun shells. Shortly after 7:30 p.m. on June 26, 2005, Berhe flagged down a car driven by Michael Robb and shot him with a shotgun. After the shooting, Valencia admitted to a Seattle detective that he and Berhe stole guns and ammunition in the course of a burglary on June 19.

---

[1] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

¶5 Officers Lim and McDaniel had had prior contact with Berhe. On June 19, Lim and McDaniel were dispatched to Berhe's home because his mother reported that Berhe was threatening suicide. Officer Lim described Berhe as acting strange and being unresponsive. Officer McDaniel noted that Berhe was "out of touch with reality most of the time." Clerk's Papers at 228.

¶6 On June 21, Bellevue police advised the Seattle Police Department Auto Theft Division that Berhe had stolen an automobile. Bellevue police also communicated that Berhe might have shotguns under his bed.

¶7 On June 22, Officer Lim was dispatched to Berhe's home, this time because of a report that Berhe had assaulted his brother's friend. In Officer Lim's presence, Berhe "spoke in normal tones then switched to deep demonic tones." *Id.* at 266. Berhe claimed that he ruled the world and that all confused people needed to be killed and tortured. Berhe was transported to Harborview Medical Center for an involuntary mental health assessment; however, a mental health professional released Berhe because the assault victim declined to testify at a commitment hearing.

¶8 On the morning of June 24, Berhe's father called 911 to report that his son and Valencia were fighting in the backyard, and both had shotguns. Several officers from the Southwest precinct responded, but they arrived too late to find either the boys or the shotguns. Seemingly contradicting his earlier report, Berhe's father then explained that there had been only one shotgun, not two, and that only Valencia had possessed the gun. According to Berhe's father, Berhe had protected his father from Valencia, never posing any threat to anyone.

¶9 Elsa Robb filed this lawsuit in January 2008. City of Seattle moved for summary judgment. The trial court denied the motion:

> The question presented by the defendants' Motion for Summary Judgment is whether the allegedly negligent actions of the

officers who contacted Samson Berhe and Raymond Valencia on 6/26/05 were affirmative acts negligently performed or more appropriately considered as failures to act. If the latter, then the public duty doctrine bars this action. *Coffel v. Clallam County*, 47 Wn. App. 397, 403[, 735 P.2d 686] (1987). If the former, then Restatement (Second) of Torts § 302B (1965) and comment "a" thereto is applicable and may provide a remedy. It is undisputed that none of the recognized exceptions to the public duty doctrine apply here to allow its use in this negligence action. *Cummins v. Lewis County*, 156 Wn.2d 844, 852-53[, 133 P.3d 458] (2006).

Applying the summary judgment standard, the plaintiff has produced sufficient evidence of affirmative acts negligently performed by defendants that a duty may be found to exist as a matter of law pursuant to Restatement (Second) of Torts § 302B.

*Id.* at 401-02.

¶10 The Court of Appeals affirmed the denial of summary judgment. *Robb v. City of Seattle*, 159 Wn. App. 133, 147, 245 P.3d 242 (2010). It held that a jury could find police acted affirmatively to create a high risk of harm to third persons, creating a duty running to Michael Robb pursuant to *Restatement* § 302B comment e. *Id.* at 146-47. The Court of Appeals understood the affirmative acts to consist of taking "control of a situation and then depart[ing] from it, leaving shotgun shells lying around within easy reach of a young man known to be mentally disturbed and in possession of a shotgun." *Id.* at 147.

## ANALYSIS

¶11 We are reviewing a denial of summary judgment and therefore make the same inquiry as the trial court, i.e., summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Taggart v. State*, 118 Wn.2d 195, 198-99, 822 P.2d 243 (1992). The facts and reasonable inferences from the facts are considered in the light most

favorable to the nonmoving party. *Id.* at 199. Questions of law are reviewed de novo. *Sherman v. State*, 128 Wn.2d 164, 183, 905 P.2d 355 (1995).

¶12 The issue we must decide here is whether the police owe a duty to protect citizens from the criminal acts of a third party where the police failed to pick up bullets from the ground near the scene of a *Terry* stop and one of the people detained but not arrested returned to the scene, picked up the bullets, and later shot a third party. Robb argues that § 302B comment e may give rise to a duty to protect another against third party conduct intended to cause harm arising from one's affirmative act where the risk of third party harm is foreseeable to a reasonable person. The city disagrees, claiming instead that § 302B goes to whether a breach has occurred and that a duty must be established through some separate means such as a special relationship. The *Restatement* and our case law indicate that Robb is correct.

¶13 As a general rule, " 'in the absence of a special relationship between the parties, there is no duty to control the conduct of a third person so as to prevent him from causing harm to another.' " *Tae Kim v. Budget Rent A Car Sys., Inc.*, 143 Wn.2d 190, 195, 15 P.3d 1283 (2001) (quoting *Richards v. Stanley*, 43 Cal. 2d 60, 65, 271 P.2d 23 (1954)). Until now, our cases involving a duty to protect a party from the criminal conduct of a third party have fallen into one of two categories: where there is a special relationship with the victim or where there is a special relationship with the criminal. *Id.* at 196-97. For example, we have found liability for the criminal acts of third parties in cases involving the relationship between a business and a business invitee, an innkeeper and a guest, the state and a probationer, and a psychotherapist and a patient. *Id.*

¶14 However, we have also recognized under *Restatement* § 302B that a duty to third parties may arise in the limited circumstances that the actor's own affirmative act creates a recognizable high degree of risk of harm. *See, e.g.,*

*Hutchins v. 1001 Fourth Ave. Assocs.*, 116 Wn.2d 217, 230, 802 P.2d 1360 (1991); *Kim*, 143 Wn.2d at 196-98. Specifically, *Restatement* § 302B provides that "[a]n act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal." Comment e further provides:

> There are, however, situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal, misconduct of others. In general, these situations arise where the actor is under a special responsibility toward the one who suffers the harm, which includes the duty to protect him against such intentional misconduct; *or where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account.*

(Emphasis added.)

¶15 *Restatement* § 314 clarifies the situations in which § 302B comment e may create an independent duty. Section 314 states, "The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." Comment a further notes:

> The general rule stated in this Section should be read together with other sections which follow. Special relations may exist between the actor and the other, as stated in § 314 A, which impose upon the actor the duty to take affirmative precautions for the aid or protection of the other. The actor may have control of a third person, or of land or chattels, and be under a duty to exercise such control, as stated in §§ 316-320. The actor's prior conduct, whether tortious or innocent, may have created a situation of peril to the other, as a result of which the actor is under a duty to act to prevent harm, as stated in §§ 321 and 322. The actor may have committed himself to the performance of an undertaking, gratuitously or under contract, and so may

have assumed a duty of reasonable care for the protection of the other, or even of a third person, as stated in §§ 323, 324, and 324 A.

¶16 This court has not yet found a duty to protect a third party from the criminal acts of another absent a special relationship, but the Court of Appeals has done so. *Parrilla v. King County*, 138 Wn. App. 427, 157 P.3d 879 (2007). In *Parrilla*, the Court of Appeals found King County owed a duty after a bus driver exited his bus with the engine running, leaving a visibly erratic man alone on board. *Id.* at 441. The Court of Appeals recognized that cases involving the criminal conduct of a third party generally require a special relationship but found the affirmative acts of the bus driver and the foreseeability and magnitude of the risk created by the driver justified imposing a duty under § 302B comment e. *Id.* at 438-39. The Court of Appeals in this case relied heavily on *Parrilla*, finding it factually analogous. We agree with the city that it is not.

¶17 The relevant provision of *Restatement* § 302B comment e requires an affirmative act that creates or exposes another to a situation of peril. Foreseeability alone is an insufficient basis for imposing a duty. Unlike here, the bus driver in *Parrilla* left his keys in the ignition of a bus, leaving the engine running and leaving a crazed individual alone on the bus. The court there found the driver's affirmative act of getting off the bus and leaving the engine running with an erratic passenger alone on board exposed motorists to a recognizable high degree of risk that a reasonable person would have foreseen, imposing on the county a duty of care to the injured motorists to guard against the man's criminal conduct. *Id.* at 440-41.

¶18 The difference between this case and *Parrilla* is the distinction between an act and an omission. This distinction is explained in *Restatement* § 314 comment c:

The origin of the rule lay in the early common law distinction between action and inaction, or "misfeasance" and "non-

feasance." In the early law one who injured another by a positive affirmative act was held liable without any great regard even for his fault. But the courts were far too much occupied with the more flagrant forms of misbehavior to be greatly concerned with one who merely did nothing, even though another might suffer serious harm because of his omission to act. Hence liability for non-feasance was slow to receive any recognition in the law. It appeared first in, and is still largely confined to, situations in which there was some special relation between the parties, on the basis of which the defendant was found to have a duty to take action for the aid or protection of the plaintiff.

Thus, under § 314, an actor might still have a duty to take action for the aid or protection of the plaintiff in cases involving misfeasance (or affirmative acts) where the actor's prior conduct, whether tortious or innocent, may have created a situation of peril to the other. Liability for nonfeasance (or omissions), on the other hand, is largely confined to situations where a special relationship exists.[2]

¶19 This conclusion is supported by *Restatement* § 302 comment a, which, according to § 302 comment a, is "equally applicable" to § 302 and § 302B. Section 302 comment a states in part,

[i]n general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act. The duties of one who merely omits to act are more restricted, and in general are confined to situations where there is a special relationship between the actor and the other which gives rise to the duty. As to the distinction between act and omission, or "misfeasance" and "non-feasance," see § 314 and Comments.

¶20 "The common law of torts has long distinguished between 'acts' and 'omissions,' refusing to impose liability for the latter, even though the line between the two is far

---

[2] Robb never argues that any special relationship existed in this case, only that § 302B independently gives rise to a duty.

from easy to draw." *Brown v. MacPherson's, Inc.*, 86 Wn.2d 293, 300, 545 P.2d 13 (1975) (citing WILLIAM L. PROSSER, HANDBOOK ON THE LAW OF TORTS § 56, at 339-40 (4th ed. 1971)). This is more properly considered a case of omission than affirmative action. *Restatement* § 314 comment a refers to misfeasance as circumstances where an actor exposes another to danger by creating a situation of peril. Misfeasance involves active misconduct resulting in positive injury to others. Francis H. Bohlen, *The Moral Duty to Aid Others as a Basis of Tort Liability*, 56 U. PA. L. REV. 217, 219 (1908); *see also Gazija v. Nicholas Jerns Co.*, 86 Wn.2d 215, 217-18, 543 P.2d 338 (1975). Misfeasance necessarily entails the creation of a new risk of harm to the plaintiff. PROSSER, *supra*, § 56, at 373. On the other hand, through nonfeasance, the risk is merely made no worse. *Id.*; *Lewis v. Krussel*, 101 Wn. App. 178, 184, 2 P.3d 486 (2000). Nonfeasance consists of "passive inaction or failure to take steps to protect others from harm." *Lewis*, 101 Wn. App. at 184 (citing PROSSER, *supra*, § 56, at 373).

¶21 Robb analogizes to a situation where a negligent driver fails to apply his or her brakes as a pedestrian crosses in front of the car. Robb claims this is affirmative action, not omission, because although the driver omitted applying brakes, the conduct must be viewed holistically as the affirmative act of negligent driving. Robb would have this court view the failure to pick up the shells as part of the broader affirmative act of taking control of a dangerous situation. However, in Robb's example, the driver affirmatively created a new risk to the pedestrian by failing to stop his or her car. Similarly, in *Parrilla*, the bus driver affirmatively created a new risk by disembarking from a bus and leaving keys in the ignition with the engine running and an erratic passenger onboard, providing the instrumentality and opportunity to cause harm.

¶22 The police officers in this case did not affirmatively create a new risk when they stopped Berhe and failed to pick up the nearby shells. The officers did not provide the

shells, nor did they give Berhe the shotgun he used to kill Robb. The officers failed to remove a risk when they did not remove the shells. Berhe would have presented the same degree of risk had Officers Lim and McDaniel never stopped him. Simply put, the situation of peril in this case existed before law enforcement stopped Berhe, and the danger was unchanged by the officers' actions. Because they did not make the risk any worse, their failure to pick up the shells was an omission, not an affirmative act, i.e., this is a case of nonfeasance.

¶23 Under the Court of Appeals' holding, the limits of liability under § 302B are too broad and do not reflect the theoretical underpinnings of the *Restatement*. That court's open-ended understanding of tort duty would require law enforcement officers to foresee and eliminate dangers everywhere they go. Although Robb insists that the rule she proposes would lead to liability only in unusual cases, in reality law enforcement could incur liability whenever it takes control of a situation where there is a recognizable high degree of risk of harm that it ultimately fails to eliminate. Yet, because of the very nature of police work, these types of situations are unavoidable and frequent. When police officers make a stop, intervene in a dispute, attempt to prevent crime, respond to a crime in progress, or respond to a crime recently committed, they must take control of a potentially dangerous situation. A high degree of risk is inherent in their work. Officers carry guns in their patrol cars and on their person and are charged with confronting unpredictable risks and dangerous instrumentalities. Amicus Washington Association of Sheriffs and Police Chiefs fairly asks whether law enforcement officers would be responsible for vehicles, baseball bats, alcohol, tire irons, and other instrumentalities they encounter around them that are subsequently used to harm others. Amicus also reasonably wonders how officers will be expected to know when they have made an affirmative act that will subject them to liability when taking control of dangerous situations is part of and parcel to their work.

¶24 The outcome of this case is dictated by basic tort principles. In order to properly separate conduct giving rise to liability from other conduct, courts have maintained a firm line between misfeasance and nonfeasance. To label the conduct here as affirmative, danger-creating conduct would threaten this distinction, leading to an unpredictable and unprecedented expansion of § 302B liability. Because law enforcement failed only to eliminate a situation of peril but did not increase the danger by an affirmative act, Officers Lim's and McDaniel's omission is insufficient to impose a duty under § 302B.[3]

## CONCLUSION

¶25 We hold a duty may arise under § 302B comment e, absent a special relationship. However, we hold that such a duty arises outside the context of a special relationship only where the actor's conduct constitutes misfeasance. Mere nonfeasance is insufficient to impose a duty on law enforcement to protect others from the criminal actions of third parties. We reject the position that the officers taking control during a *Terry* stop constitutes an affirmative act for purposes of imposing a duty under *Restatement* § 302B comment e. There was no affirmative act in this case, only an omission, because law enforcement did not create a new risk of harm but instead failed to eliminate a risk when they failed to pick up bullets left at the scene by another. We reverse the Court of Appeals' decision upholding the trial court's denial of the City of Seattle's motion for summary

---

[3] Because we hold that the failure to remove bullets left by others at the scene of a *Terry* stop is not an affirmative act within the contemplation of comment e, we do not reach the question of whether the public duty doctrine would act to bar this action.

judgment, and we remand to the trial court with directions to dismiss.

C. JOHNSON, OWENS, FAIRHURST, J.M. JOHNSON, STEPHENS, and WIGGINS, JJ., concur.

GONZÁLEZ, J., and CHAMBERS, J. PRO TEM., concur in the result only.