IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | |
|---|---|
| SHIZUKO MITA, surviving spouse of Kay )<br>K. Mita; and FLOYD MITA, individually, )<br>and as Personal Representative of the )<br>Estate of Kay K. Mita, )<br> )<br> Appellants, )<br> )<br> v. )<br> )<br>GUARDSMARK, LLC, a Delaware limited )<br>liability company; and SPOKANE )<br>COUNTY, a municipal corporation of the )<br>State of Washington, )<br> )<br> Respondents. ) | No. 31457-0-III<br><br><br><br><br><br>PUBLISHED OPINION |

BROWN, A.C.J. — The estate of Kay Mita, along with Shizuko Mita and Floyd Mita

individually, appeal the summary judgment dismissal of their negligence suit against

Spokane County (County) and Guardsmark, LLC, arising from the tragic death of Kay.[1]

The Mitas contend the trial court erred in ruling the County and Guardsmark owed Kay

no duty of care. We agree with the Mitas. Thus, we reverse and remand for further

proceedings.

---

[1] For clarity, we refer to the Mitas by their given names.

No. 31457-0-III
*Mita v. Guardsmark, LLC*

## FACTS

Because we are reviewing summary judgment, we present the facts in the light most favorable to the Mitas as the nonmoving party. On the morning of November 26, 2007, 84-year-old Kay reported to the Spokane County Superior Court as a potential juror. When he parked his car and walked to the courthouse, the temperature outside was about 23 degrees with a wind chill of 17 degrees Fahrenheit. The temperature remained in the 20s all day while snow accumulated.

Around 12:00 p.m., the trial judge dismissed the jury panel with instructions to return by 2:00 p.m. Kay did not return to the jury room. A jury manager soon called Shizuko, Kay's 82-year-old wife, and asked about Kay's location. Shizuko answered she did not know, then recounted the conversation to Floyd, her adult son.

Around 5:00 p.m., the trial judge's court clerk left the courthouse and saw Kay in the parking lot as she walked to her car. When the clerk asked Kay why he did not return to the jury room, he answered he had been searching for his car all afternoon but could not find it. He declined her offers of assistance and repeated he could not find his car. Upon her suggestion, he started back to the courthouse to seek help from security personnel. In an interview with the Mitas' expert witness, the clerk said Kay "seemed confused and bewildered." Clerk's Papers (CP) at 389, 402. But in her later affidavit supporting the County's summary judgment motion, the clerk said Kay "was coherent and interacted appropriately." CP at 250.

2

A Guardsmark security officer saw Kay enter the courthouse and sit down on a bench next to a heater at about 5:10 p.m. At 5:30 p.m., the officer ushered Kay out the main door and locked the courthouse.

Floyd and Shizuko became very concerned when Kay did not return home from the courthouse between 6:00 and 6:30 p.m. Around 6:50 p.m., Floyd called the Spokane Crime Reporting Center (SCRC), a service provided by the County for nonemergencies, including missing person reports. Floyd told the call receiver Kay was missing. SCRC instructed Floyd to contact the four local hospitals and call the reporting center back if he could not find Kay.

Floyd followed these instructions and called SCRC back at about 7:11 p.m. to officially report Kay as missing. This time, SCRC collected information about Kay, including his name, sex, age, race, weight, height, and other physical descriptors, to assist a law enforcement officer in searching for him. Floyd narrated for SCRC how Kay did not return to the jury room that afternoon and did not return home from the courthouse that evening, which was unusual because he was a very responsible person. SCRC asked Floyd if Kay had parked his car in a jury lot. Floyd answered affirmatively and described the car. Floyd told SCRC he had not searched for Kay because Shizuko was very worried and he was afraid to leave her at home alone.

Then, Floyd told SCRC he was "'very concerned' about the fact it was snowing and very cold outside." CP at 665. "[T]he call receiver replied, with concern and urgency in her voice, . . . 'we will send out a policeman to immediately search for your father.'" *Id.* The call receiver soon repeated SCRC would immediately send a law

3

enforcement officer to search for Kay and contact Floyd when the officer found Kay. Trusting these statements, Floyd forwent his own search efforts and waited for an officer to contact him about Kay. However, SCRC never transmitted the missing person report to dispatch and no law enforcement officer searched for Kay.

Meanwhile, at 6:00 p.m., local law students began using the courthouse to conduct mock trials. Guardsmark assigned two security officers to facilitate the event while the courthouse remained locked. Around 7:00 p.m., the officers saw Kay pacing outside the main door, stopping periodically to peer inside. The officers noted Kay was cold, sluggish, and shivering because he was underdressed for the ongoing snowstorm and subfreezing temperatures. The temperature outside was then about 26 degrees with a wind chill of 19 degrees Fahrenheit. Kay was thin, weighing just 146 pounds, and was wearing only corduroy slacks and a light jacket. Thinking Kay was homeless or transient, the officers brought him inside the locked courthouse and seated him next to the heater. As they did so, the officers saw Kay was very cold, shaking, and unable to communicate intelligibly.

Around 8:45 p.m., the officers unlocked the main door for the law students to exit. Then, at 9:00 p.m., the officers ushered Kay back outside the courthouse and locked the main door. It was still snowing and the temperature outside was about 27 degrees with a wind chill of 21 degrees Fahrenheit. That night, Kay died of hypothermia, slumped against a garbage container near the front steps of the courthouse. By the time someone found him, he was covered in about two inches of snow. Investigators found his car in the juror parking area covered with snow.

4

No. 31457-0-III
*Mita v. Guardsmark, LLC*

The Mitas sued the County and Guardsmark for wrongful death based on negligence. Both the County and Guardsmark moved successfully for summary judgment, arguing they owed Kay no duty of care. The Mitas appealed.

ANALYSIS

The issue is whether the trial court erred in summarily dismissing the Mitas' negligence suit. The Mitas contend the County and Guardsmark owed Kay a duty of care imposed by common law, specifically the voluntary rescue doctrine and a special relationship.

We review summary judgment de novo, engaging in the same inquiry as the trial court. *Highline Sch. Dist. No. 401 v. Port of Seattle*, 87 Wn.2d 6, 15, 548 P.2d 1085 (1976); *Mahoney v. Shinpoch*, 107 Wn.2d 679, 683, 732 P.2d 510 (1987). Summary judgment is proper if the records on file with the trial court show "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." CR 56(c). A genuine issue is one upon which reasonable people may disagree; a material fact is one controlling the litigation's outcome. *Morris v. McNicol*, 83 Wn.2d 491, 494, 519 P.2d 7 (1974); *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). We construe all evidence and reasonable inferences in the light most favorable to the nonmoving party. *Barber v. Bankers Life & Cas. Co.*, 81 Wn.2d 140, 142, 500 P.2d 88 (1972); *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). We limit our review to evidence and issues the parties called to the trial court's attention. RAP 9.12.

5

No. 31457-0-III
*Mita v. Guardsmark, LLC*

The threshold issue in a negligence suit is whether the defendant owed the plaintiff a duty of care, a legal question for the court. *Pedroza v. Bryant*, 101 Wn.2d 226, 228, 677 P.2d 166 (1984); *Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 933, 653 P.2d 280 (1982). However, "summary judgment is inappropriate where the existence of a legal duty depends on disputed material facts" requiring jury resolution. *Afoa v. Port of Seattle*, 176 Wn.2d 460, 466, 296 P.3d 800 (2013); *see Sjogren v. Props. of Pac. Nw., LLC*, 118 Wn. App. 144, 148, 75 P.3d 592 (2003). A duty is "'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.'" *Transam. Title Ins. Co. v. Johnson*, 103 Wn.2d 409, 413, 693 P.2d 697 (1985) (quoting WILLIAM L. PROSSER, HANDBOOK OF THE LAW OF TORTS § 53, at 331 (3d ed. 1964)). Whether a duty exists depends on "mixed considerations of 'logic, common sense, justice, policy, and precedent.'" *Snyder v. Med. Serv. Corp. of E. Wash.*, 145 Wn.2d 233, 243, 35 P.3d 1158 (2001) (quoting *Lords v. N. Auto. Corp.*, 75 Wn. App. 589, 596, 881 P.2d 256 (1994)).

We begin with whether the County owed Kay a duty of care. A local government is liable in tort "to the same extent as if [it] were a private person or corporation." RCW 4.96.010(1). Applying this liability can be problematic because statutes, ordinances, and administrative rules mandate that public entities perform many functions private entities do not. *Munich v. Skagit Emergency Commc'ns Ctr.*, 175 Wn.2d 871, 887, 288

6

P.3d 328 (2012) (Chambers, J., concurring).[2] Thus, where a plaintiff alleges the public entity breached a duty imposed by statute, ordinance, or administrative rule, we must employ the public duty doctrine as a tool analyzing whether the legislative body intended the duty to extend to the general public or a particular class of individuals. *Id.* at 888. If the public entity owes this legislatively mandated duty to the general public, it does not owe the duty to any particular person harmed by its breach. *See id.* at 888-90. This limitation ensures the public entity has no greater liability than private entities. *See id.* at 886, 894. However, the public duty doctrine does not apply where, as here, a plaintiff alleges the public entity breached a common law duty it shares in common with private entities.[3] *Id.* at 888, 894. As a matter of law, the public entity owes this common law duty to a person it should reasonably foresee may be harmed by its breach. *Id.* at 891.

Under common law, a defendant owes a plaintiff the duty to exercise reasonable care if (1) the defendant, by act or misfeasance, poses a risk of harm to the plaintiff, as where the defendant actively creates or increases peril and exposes the plaintiff to it; or (2) the defendant, by omission or nonfeasance, fails to prevent harm to the plaintiff

---

[2] Justice Chambers's concurring opinion has precedential value because it received five votes from justices who also signed the majority opinion.

[3] While we do not apply the public duty doctrine, we acknowledge it has four exceptions that embody traditional tort principles and, therefore, are better conceptualized as explanations why the public entity owes a duty to a particular person harmed by its breach. *Taggart v. State*, 118 Wn.2d 195, 217-18, 822 P.2d 243 (1992). These exceptions include (1) "legislative intent," (2) "failure to enforce," (3) the "rescue doctrine," and (4) a "special relationship." *Hoffer v. State*, 110 Wn.2d 415, 423, 755 P.2d 781 (1988) (citing *Bailey v. Town of Forks*, 108 Wn.2d 262, 268, 737 P.2d 1257, 753 P.2d 523 (1987)). Cases discussing the last two exceptions inform our common law duty analysis here.

No. 31457-0-III
*Mita v. Guardsmark, LLC*

despite an obligation to do so, as where the defendant passively tolerates peril after voluntarily assuming responsibility to protect the plaintiff from it. *See Robb v. City of Seattle*, 176 Wn.2d 427, 436-37, 295 P.3d 212 (2013); 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 2:2, at 37-38 (4th ed. 2013). Our case mainly concerns omissions or nonfeasance. Our focus is the voluntary rescue doctrine and a special relationship.[4]

An actor generally has no duty to rescue a stranger. *Folsom v. Burger King*, 135 Wn.2d 658, 674, 958 P.2d 301 (1998). But under the voluntary rescue doctrine, an actor owes a duty to a person he or she should know is in need if (1) the actor voluntarily promises to aid or warn the person in need, and (2) the person in need reasonably relies on the promise or a third person who reasonably relies on the promise. *Osborn v. Mason County*, 157 Wn.2d 18, 25-26, 134 P.3d 197 (2006); *Folsom*, 135 Wn.2d at 675-77; *Chambers-Castanes v. King County*, 100 Wn.2d 275, 285 n.3, 669 P.2d 451 (1983); *Brown v. MacPherson's, Inc.*, 86 Wn.2d 293, 300-01, 545 P.2d 13 (1975); *see* RESTATEMENT (SECOND) OF TORTS §§ 323(b), 324A(c) (1965); RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM §§ 42(b), 43(c) (2012).

The person in need may reasonably rely on the promise if it induces him or her to "refrain from seeking help elsewhere." *Folsom*, 135 Wn.2d at 676; *Brown*, 86 Wn.2d at 300. The person in need may reasonably rely on the third person if "privity of reliance"

---

[4] Though the voluntary rescue doctrine and a special relationship are distinct, we analyze them together because they are analogous and intertwined. *See Munich*, 175 Wn.2d at 894 (Chambers, J., concurring).

8

exists between them. *Osborn*, 157 Wn.2d at 26. The third person, in turn, may reasonably rely on the promise if it induces him or her to "refrain from acting on . . . behalf" of the person in need. *Chambers-Castanes*, 100 Wn.2d at 285 n.3; *accord Brown*, 86 Wn.2d at 299-300. "[Either] person may reasonably rely on explicit or implicit assurances." *Osborn*, 157 Wn.2d at 26; *Brown*, 86 Wn.2d at 301.

Additionally, an actor owes a common law duty to a person with whom he or she has a special relationship. *Folsom*, 135 Wn.2d at 674-75. A special relationship arises between a public entity and a person where (1) the entity has direct contact or privity with the person that sets him or her apart from the general public, (2) the entity makes an express assurance, and (3) the person justifiably relies on the assurance. *Taylor v. Stevens County*, 111 Wn.2d 159, 166, 759 P.2d 447 (1988).

Where a public entity negligently responds to a request for assistance, we broadly construe privity to encompass the relationship between the entity and a person it should reasonably foresee may be harmed by its breach. *Bratton v. Welp*, 145 Wn.2d 572, 577, 39 P.3d 959 (2002); *Chambers-Castanes*, 100 Wn.2d at 286. A public entity may have privity with a person even if it does not communicate with him or her personally. *Cummins v. Lewis County*, 156 Wn.2d 844, 854, 133 P.3d 458 (2006); *Bratton*, 145 Wn.2d at 577. A public entity makes an express assurance when it tells a person it has sent or will send a law enforcement officer. *Munich*, 175 Wn.2d at 884; *Bratton*, 145 Wn.2d at 577; *Beal v. City of Seattle*, 134 Wn.2d 769, 785, 954 P.2d 237 (1998); *Chambers-Castanes*, 100 Wn.2d at 287. Justifiable reliance is a factual

question not generally amenable to summary judgment. *Munich*, 175 Wn.2d at 879; *Beal*, 134 Wn.2d at 786-87.

The County had direct contact with Floyd when he called SCRC on the telephone.[5] Based on the information Floyd provided SCRC, the County should have known Kay was in need. The Mitas presented evidence the County made an express assurance to Floyd when the call receiver told him SCRC would immediately send a law enforcement officer to search for Kay and contact Floyd when the officer found Kay. Floyd reasonably relied on this promise because it induced him to forgo his own search efforts and wait for an officer to contact him about Kay. In his vulnerable state, Kay reasonably relied on his immediate family members to find him, thereby establishing privity of reliance between him and Floyd. And, because SCRC should have reasonably foreseen Kay might be harmed if it failed to send an officer to search for him, the County had privity with Kay setting him apart from the general public. Therefore, the Mitas argue, the County owed Kay a common law duty under the voluntary rescue doctrine and a special relationship.

The County disputes whether SCRC promised to send aid to Kay. But in this summary judgment appeal, we view the facts most favorably to the Mitas as the

---

[5] The County invites us to ignore all evidence of this conversation because it is hearsay. We cannot decide this issue because the trial court admitted the evidence for purposes of summary judgment and the County did not cross-appeal that ruling. Even so, the County is incorrect. The Mitas did not offer the out-of-court statements to prove the truth of the matters they assert. *See* ER 801(c). The statements the County made to Floyd are admissible as party-opponent admissions. *See* ER 801(d)(2). The statements Floyd made to the County are admissible to show what information he provided that prompted it to make an express assurance. *See* ER 801(c).

nonmoving party. Whether SCRC made the promise is, of course, a material fact left for further summary judgment proceedings or trial. Our focus is on whether the facts viewed most favorably to the Mitas raise a legal duty under the voluntary rescue doctrine and a special relationship, and we conclude under our standard of review that they do. Therefore, the trial court erred in summarily dismissing the Mitas' negligence suit against the County.

Next, we turn to whether Guardsmark owed Kay a duty of care. Under the voluntary rescue doctrine, an actor owes a duty to a person he or she should know is in need if (1) the actor voluntarily undertakes to aid or warn the person in need, and (2) the undertaking increases the risk of harm to the person in need. *Folsom*, 135 Wn.2d at 675-77; *Brown*, 86 Wn.2d at 299-300; *see* RESTATEMENT (SECOND) OF TORTS § 323(a); RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 42(a). But a special variation of this rule is more relevant here.

An actor owes a duty to a person who reasonably appears imperiled and incapable of adequately caring for himself or herself if (1) the actor voluntarily takes charge of the helpless person intending to assist him or her in confronting the peril, and (2) the actor discontinues the assistance and leaves the helpless person in a worse position than before. *See* RESTATEMENT (SECOND) OF TORTS § 324(b); RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 44(b); *see also* BLACK'S LAW DICTIONARY 1253 (9th ed. 2009) (defining peril as "[e]xposure to the risk of

11

injury, damage, or loss" without limiting it to the risk of death).[6]

The helpless person may be imperiled by a "force of nature" and incapable of adequately caring for himself or herself because of age or other circumstances. RESTATEMENT (SECOND) OF TORTS § 324 cmt. b. Imminent peril is sufficient but not necessary. *See Folsom*, 135 Wn.2d at 675-77; RESTATEMENT (SECOND) OF TORTS § 324 & cmts.[7] The actor cannot, after successfully removing the helpless person from some peril, unreasonably put him or her "back into the same peril, or into a new one." RESTATEMENT (SECOND) OF TORTS § 324 cmt. g. Doing so would leave the helpless person in a worse situation than before, and thereby increases the risk of harm to him or her, because the assistance "misle[d the helpless person] into believing the danger had been removed" and meanwhile "depriv[ed him or her] of the possibility of help from

---

[6] The *Restatement (Second) of Torts* § 324(b) provides,

> One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by[:]
>
> . . . .
>
> (b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him.

*See also* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 44(b). While our courts have not had an occasion to adopt § 324(b), they already recognize its fundamental principles. *See Folsom*, 135 Wn.2d at 676-77; *Webstad v. Stortini*, 83 Wn. App. 857, 874, 924 P.2d 940 (1996). Therefore, we do not hesitate to apply § 324(b) here.

[7] *Cf. French v. Chase*, 48 Wn.2d 825, 830, 297 P.2d 235 (1956) (requiring a reasonable appearance of imminent peril in a different variety of the rescue doctrine applicable where an injured rescuer seeks compensation from a person who caused the danger requiring rescue); *McCoy v. Am. Suzuki Motor Corp.*, 136 Wn.2d 350, 355, 961 P.2d 952 (1998) (explaining the imminent peril requirement, like the other elements in

12

other sources." *Folsom*, 135 Wn.2d at 676; *see* RESTATEMENT (SECOND) OF TORTS § 324 cmt. g.

The Mitas presented evidence Guardsmark should have known Kay was in need, considering the ongoing snowstorm and subfreezing temperatures combined with his lack of suitable clothing, advanced age, and thin build, as well as his earlier sluggishness, shivering, shaking, and inability to communicate intelligibly. Moreover, the Mitas presented evidence that Kay reasonably appeared imperiled by a natural force and incapable of adequately caring for himself because of age and other circumstances. By bringing him inside the locked courthouse and seating him next to the heater for two hours, Guardsmark took charge of Kay, intending to assist him in confronting the peril. But after successfully removing Kay from this peril, Guardsmark put him back outside the locked courthouse into the same peril, or into a new one. Arguably, doing so left Kay in a worse situation than before and increased the risk of harm to him because, in his seemingly confused and bewildered state, the assistance misled Kay into believing Guardsmark had removed the danger and meanwhile deprived him of an opportunity to seek help outside the locked courthouse. Therefore, the Mitas argue, Guardsmark owed Kay a common law duty under the voluntary rescue doctrine.

Guardsmark disputes whether Kay reasonably appeared imperiled and incapable of adequately caring for himself. But in this summary judgment appeal, we view the facts most favorably to the Mitas as the nonmoving party. Whether Kay reasonably

---

that variety of the rescue doctrine, exists partly to negate the argument that the rescuer

appeared this way is, of course, a material fact left for further summary judgment proceedings or trial. Our focus is on whether the facts viewed most favorably to the Mitas raise a legal duty under the voluntary rescue doctrine, and we conclude under our standard of review that they do. Therefore, the trial court erred in summarily dismissing the Mitas' negligence suit against Guardsmark.

The County and Guardsmark urge us to affirm for two additional reasons. First, the County and Guardsmark argue they could not have reasonably foreseen Kay's death. Whether some general form of harm was foreseeable is an issue concerning the existence of a duty, a topic central to this appeal. But whether death, as a particular form of harm, was foreseeable is a different issue concerning the scope of a duty. We do not decide this foreseeability of death issue because we think the parties need to develop it further on remand. Second, the County and Guardsmark argue they did not breach any duty, even if they owed one to Kay. We do not decide this breach of duty issue because the parties did not raise it on summary judgment.

Reversed.

_____
Brown, A.C.J.

WE CONCUR:

_____
Fearing, J.

_____
Lawrence-Berrey, J.

assumed the risk of injury in confronting the danger requiring rescue).

14