

IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| FELIX W. SCHUCK, an individual, | ) | No. 36754-1-III |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GORDON BECK and JANE DOE BECK, | ) | |
| individually and the marital community | ) | |
| composed thereof; TIM JACKSON and | ) | UNPUBLISHED OPINION |
| ROBERTA JACKSON, individually and | ) | |
| the marital community composed thereof; | ) | |
| IBEX CONSTRUCTION, INC., a | ) | |
| Washington corporation; and JOHN DOE | ) | |
| 1-5, entities or individuals, | ) | |
| | ) | |
| Respondents. | ) | |

ANDRUS, J. – Felix Schuck appeals the dismissal of his claims against Tim

Jackson and Jackson's construction company, Ibex Construction, Inc.[1]  Schuck

sustained serious injuries after a steel tank—transported from Jackson's property to

Schuck's place of employment, Pacific Steel & Recycling—leaked deadly chlorine

gas during the recycling process.  Schuck sued Jackson, as well as Tom Reinland,

---

[1] The complaint names Tim Jackson, his wife, Roberta, and Ibex as
defendants.  Any reference to "Jackson" in this opinion refers to Tim, Roberta, their
marital community, and Ibex collectively.

who purchased scrap metal from Jackson, and Gordon Beck, who loaded the tank onto a truck for transport to Pacific. The trial court dismissed Schuck's claims against Beck and Jackson on summary judgment, concluding that they did not owe a legal duty to him. Schuck appeals only the dismissal of the claims against Jackson. Because Jackson owed no common law or statutory duty to Schuck under the facts of this case, we affirm.

## FACTS

Tim Jackson owns a five-acre parcel of industrial property in Spokane, Washington (Jackson Property). The Jackson Property contains several buildings, the majority of which Jackson leased over the years to a number of different commercial tenants. Jackson operated his construction company, Ibex Construction, on a portion of the property. Ibex, which primarily constructed roads and highways, stopped operations around 2013.

On July 31, 2015, Jackson and Tom Reinland, an auctioneer, entered into an agreement, as documented in a bill of sale, for the purchase of "chippers, [a] loader, tools, shop equipment, misc., scrap iron." Reinland testified that "misc." in the bill of sale referred to various pipe fittings, nuts, bolts, and bolt cabinets that Jackson had on the property. He also stated that "scrap iron" referred to any salvageable iron he found on the property. Jackson testified that he sold "everything" on the property to Reinland, excluding items fixed to the real estate, like the buildings or items that the commercial tenants had marked with a green "X." Jackson and

2

Reinland orally agreed that Reinland could remove anything he wanted from the Jackson Property, with the exception of the marked items, and that anything that Reinland did not take remained on the property. Reinland paid Jackson $32,500 under the bill of sale.

Reinland asked Gordon Beck, a part-time recycler with 45 years of experience, to assist him with scrapping metal from the Jackson Property. Reinland and Beck agreed to split the proceeds of any scrap metal 60/40, with Beck receiving the larger share, in exchange for Beck's assistance locating and transporting scrap metal. Reinland collected the items he wanted to auction, while Beck arranged for Pacific to pick up scrap metal.

On the morning of August 12, 2015, Beck used an excavator to load a large cylindrical tank, along with other recyclable items, onto a Pacific truck. A Pacific driver transported the load to Pacific's facility to be recycled. Later that morning, Pacific employee Ed Dumaw placed the tank into a recycling machine called a shear. According to an incident report by Pacific's safety director, during this process, the valves on the tank blew off, causing a "greenish substance" to escape from the tank and creating a gas cloud. The gaseous substance that spilled from the tank was later determined to be chlorine gas. Dumaw, Schuck, three other Pacific employees, and one nonemployee, experienced difficulty breathing and had to be hospitalized. Dumaw did not survive.

Jackson testified that he did not own the tank and had never seen it before. He knew that some tanks had been "lying around" on the property for 25, possibly 35, years. But Jackson denied ever seeing this particular tank. Jackson speculated that a former tenant left the tank after vacating the property or that someone could have dumped the tank there without his knowledge.

Beck testified that he thought the tank was a piece of construction equipment, like a roller. He did not see any exposed valves, and he thought hazardous tanks usually had guards around valves and warning placards, which this tank lacked. Beck testified that the appearance of this tank did not "throw up a red flag."

Reinland testified that he knew tanks were not salvageable iron unless the tanks had been emptied and the valves removed. Pacific's policy was to reject all tanks or drums without an "empty tank certificate." It was also against Pacific policy to accept hazardous waste, pressurized gas cylinders, or other sealed containers that had not been visibly unsealed.

Schuck filed this lawsuit against Reinland, Beck, and Jackson, alleging that they were liable under common law negligence theories and strictly liable for engaging in abnormally dangerous activities. He also alleged that they failed to properly dispose of hazardous waste in violation of chapter 70.105 RCW, the Hazardous Waste Management Act (HWMA).

4

Jackson moved for summary judgment after the trial court dismissed Schuck's claims against Beck.[2] The trial court initially concluded that Jackson did not owe Schuck a statutory duty of care under the HWMA and dismissed that claim. It also determined that Schuck failed to establish that Jackson engaged in abnormally dangerous activity and dismissed the strict liability claim. The trial court, however, found genuine issues of material fact as to whether Jackson knew of the tank and its contents. The trial court also determined that there were genuine issues of fact as to causation.

On reconsideration, the trial court concluded that Jackson did not owe a duty of care to Schuck under the *Restatement (Second) of Torts* § 388 (Am. Law Inst. 1965), and dismissed the negligence claim, with prejudice, to the extent it was based on that section of the *Restatement*. It subsequently dismissed Schuck's negligence claim in its entirety, with prejudice, concluding that liability under § 388 was the only negligence theory available to Schuck because the other theories he advanced—duties under § 343 (premises liability) and § 302B (liability for criminal acts of third parties)—were inapplicable to the case.

Schuck appeals. First, relying on §§ 302, 388, and 392 of the *Restatement*, he contends the trial court erred in concluding that Jackson owed no common law

---

[2] On October 2, 2018, the trial court granted Beck's summary judgment motion and dismissed Schuck's claims against Beck. Schuck does not appeal from that ruling. Reinland remains a defendant in the case. The trial court certified the judgment in favor of Jackson and Ibex as final under CR 54(b) and stayed further proceedings pending the outcome of this appeal.

duty of care to him. Second, he maintains the trial court erred in concluding that Jackson was not strictly liable to him for engaging in abnormally dangerous activities under *Restatement (Second) of Torts* § 520 (Am. Law Inst. 1977). Finally, he argues the trial court erred in concluding that Jackson could not be held liable under the HWMA.[3]

ANALYSIS

Summary judgment is appropriate when the moving party is entitled to a judgment as a matter of law. CR 56(c). The moving party bears the burden of demonstrating that there is no genuine issue of material fact, and the court draws all reasonable inferences in favor of the nonmoving party. *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). An appellate court performs the same inquiry as the trial court when reviewing an order for summary judgment. *Id.* Questions of law are reviewed de novo. *Robb v. City of Seattle*, 176 Wn.2d 427, 433, 295 P.3d 212 (2013).

---

[3] On March 26, 2020, Jackson filed a Statement of Additional Authorities containing citations to the record and to cases with parenthetical explanations. Some of these statements contained argument. Schuck filed a motion to strike. RAP 10.8 permits a party to submit additional authorities for the court's consideration before the decision is filed. "The statement of additional authorities must be filed 'without argument,' but may include a short comment indicating the portion of the brief or argument to which the authorities pertain." *Plum Creek Timber Co. v. Wash. State Forest Practices Appeals Bd.*, 99 Wn. App. 579, 587 n.2, 993 P.2d 287 (2000). We agree with Schuck that these materials contained improper argument and do not qualify under RAP 10.8. We therefore grant Schuck's motion to strike the March 26, 2020 submission.

*Schuck's Common Law Negligence Claim*

Schuck first argues that Jackson owed him a common law duty of care under the *Restatement* §§ 388 and 302. To prove negligence, Schuck must prove the existence of a duty, a breach of that duty, and causation. *Vargas v. Inland Wash., LLC*, 194 Wn.2d 720, 730, 452 P.3d 1205 (2019); *see also Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). The existence of a duty is a question of law reviewed de novo. *Vargas*, 194 Wn.2d at 730.

*Restatement* § 388, entitled "Chattel Known to be Dangerous for Intended Use," provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> > (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
> >
> > (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
> >
> > (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

In order to have a claim under § 388, a party must satisfy all three subsections (a), (b), and (c). *Mele v. Turner*, 106 Wn.2d 73, 79, 720 P.2d 787 (1986). *Restatement* § 392, entitled "Chattel Dangerous for Intended Use," imposes liability on those who supply chattel to be used for the supplier's business purposes if the supplier

fails to exercise reasonable care to make the chattel safe for the use for which it is supplied or fails to discover its dangerous condition and to warn the users of that danger.

But under both provisions of the *Restatement*, liability is limited to items that are dangerous "for their intended use." Comment e to § 388 elaborates:

> *e. Ambit of liability.* The liability stated in this Section exists only if physical harm is caused *by the use of the chattel* by those for whose use the chattel is supplied, and *in the manner for which it is supplied. . . .*
>
> In order that the supplier of a chattel may be subject to liability under the rule stated in this Section, not only must the person who uses the chattel be one whom the supplier should expect to use it with the consent of him to whom it is supplied, *but the chattel must also be put to a use to which the supplier has reason to expect it to be put*.

 (Emphasis added.)

There is no evidence in the record that Jackson had any reason to expect that Reinland intended to recycle the chlorine gas tank. Jackson testified that he was at his home in Montana and was therefore not present on site when Beck selected the tank for recycling and arranged for its transport to Pacific. Under the bill of sale, Reinland was free to identify anything on Jackson's property that Reinland deemed to have value, either to auction or to scrap. Reinland had no obligation to remove and dispose of the tank and could have left it there if he determined it was not recyclable.

Reinland knew that pressurized tanks were not recyclable. Beck similarly testified that he would not have touched a tank, let alone taken it to be recycled.

8

And Pacific's policies required employees to reject pressurized tanks unless emptied and certified. By placing the tank into the shear, the Pacific employees put the tank to a use that Jackson had no reason to anticipate. For this reason, the trial court did not err in concluding that Jackson owed Schuck no duty of care under *Restatement* §§ 388 or 392.

Schuck also argues that Jackson owed him a duty of care under *Restatement* § 302, which provides:

> A negligent act or omission may be one which involves an unreasonable risk of harm to another through either
>
>> (a) the continuous operation of a force started or continued by the act or omission, or
>>
>> (b) the foreseeable action of the other, a third person, an animal, or a force of nature.

The reference to the "foreseeable action of . . . a third [party]" in § 302 is further defined by *Restatement* §§ 302A and 302B. RESTATEMENT § 302 cmt. j. *Restatement* § 302A[4] describes the duty to intervene to prevent the negligence of a third party. And *Restatement* § 302B[5] describes the duty to intervene to prevent the intentional or criminal conduct of a third party. Schuck contends that Jackson owed

---

[4] "An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the negligent or reckless conduct of the other or a third person."

[5] "An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal."

him a duty to know the tank was present on the Jackson Property and to warn

Reinland, Beck, or the Pacific employees not to recycle the chlorine gas tank. We

disagree.

Our Supreme Court's decision in *Robb v. City of Seattle* is instructive. In

that case, the court said that there is generally no duty to prevent a third person from

causing harm to another, absent a special relationship with the injured party. 176

Wn.2d at 433. But the court acknowledged:

> "There are . . . situations in which the actor, as a reasonable man, is
> required to anticipate and guard against the intentional, or even
> criminal, misconduct of others. In general, these situations arise
> where . . . the actor's own affirmative act has created or exposed the
> other to a recognizable high degree of risk of harm through such
> misconduct, which a reasonable man would take into account."

*Id.* at 434 (emphasis omitted) (quoting RESTATEMENT § 302B cmt. e). The court

also noted that foreseeability of harm from the actions of a third party "alone is an

insufficient basis for imposing a duty." *Id.* at 435. Instead, relying on comment a

to § 302, our Supreme Court held that the key is whether the claimed negligence is

based on an alleged affirmative act that created the risk of harm or an alleged

omission. *Id.* at 436. The former would result in a duty under § 302B, while the

latter would not. *Id.* at 436-37.

In *Robb*, law enforcement officers conducted a *Terry*[6] stop on a burglary

suspect, Samson Berhe, but failed to pick up shotgun cartridges on the ground near

---

[6] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

Berhe. *Id.* at 429-30. After his release, Berhe retrieved the cartridges and used one

to kill Robb. *Id.* at 429. Robb's widow sued the City of Seattle, arguing the officers

were negligent in failing to collect the cartridges after the *Terry* stop. *Id.* The court

rejected Robb's widow's contention that the officers owed Robb a duty under

§ 302B:

> The police officers in this case did not affirmatively create a
> new risk when they stopped Berhe and failed to pick up the nearby
> shells. The officers did not provide the shells, nor did they give Berhe
> the shotgun he used to kill Robb. The officers failed to remove a risk
> when they did not remove the shells. Berhe would have presented the
> same degree of risk had Officers Lim and McDaniel never stopped
> him. Simply put, the situation of peril in this case existed before law
> enforcement stopped Berhe, and the danger was unchanged by the
> officers' actions. Because they did not make the risk any worse, their
> failure to pick up the shells was an omission, not an affirmative act,
> i.e., this is a case of nonfeasance.

*Id.* at 437-38. Accordingly, the court concluded, the failure to eliminate a peril does

not give rise to liability for the harm caused by a third party under § 302B. *Id.* at

439.

Here, Schuck's claim is based on Jackson's failure to eliminate the peril

presented by Pacific's decision to place a pressurized tank into a shear. This is a

failure to act—the failure to investigate what was dumped on the Jackson Property

and the failure to warn others of the dangers presented by the steel tank. As in *Robb*,

the failure to prevent Reinland or Beck from removing the tank from the property

or to warn them of the hazardous material in that tank is an omission, not an

affirmative act that created a new risk of harm to Schuck. The trial court correctly concluded that Jackson did not owe Schuck a duty of care under § 302B.[7]

*Schuck's Common Law Strict Liability Claim*

Schuck next argues that Jackson engaged in abnormally dangerous activities by disposing of a tank filled with chlorine gas, making him strictly liable for Schuck's injuries. Jackson contends that the only activity in which he engaged was a commercial transaction—the sale of items on his property—an act that is not abnormally dangerous. We agree with Jackson.

Whether an activity is an abnormally dangerous activity is a question of law. *Klein v. Pyrodyne Corp.*, 117 Wn.2d 1, 6, 817 P.2d 1359 (1991). The *Restatement* § 519 provides:

> (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

> (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Courts consider the following factors in determining what constitutes an abnormally dangerous activity:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;

---

[7] Schuck argues, for the first time on appeal, that Jackson owed him a duty of care under § 302A. Because this argument was not raised below, we decline to address it on appeal. RAP 2.5(a), 9.12; *see also Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 290, 840 P.2d 860 (1992) ("Arguments or theories not presented to the trial court will generally not be considered on appeal.").

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

RESTATEMENT § 520. "The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even though it is carried on with all reasonable care." RESTATEMENT (SECOND) OF TORTS § 520 cmt. f (1977).

In the present case, the trial court dismissed Schuck's strict liability claim on summary judgment, reasoning that:

> Here, the record fails to establish [Jackson was] engaged in an abnormally dangerous activity. Neither the magnitude nor the circumstances surrounding the disposal of a single tank created an unusual risk that could not have been easily . . . mitigated. Had reasonable care been used in the disposal of the tank, the risk of harm would have been minimal.

We agree that these factors weigh against strict liability. The fact that a tank of chlorine gas can be safely disposed of undermines the argument that Jackson should be held strictly liable. *See* RESTATEMENT OF TORTS (Second) §520 cmt. h (1977) ("Another important factor to be taken into account in determining whether the

activity is abnormally dangerous is the impossibility of eliminating the risk by the exercise of reasonable care."). Had Reinland, Beck, or Pacific properly disposed of the tank, it would not have posed a threat of injury or been otherwise dangerous.

We also agree with Jackson that the only activity in which he engaged was to contract with Reinland for the sale of items on the property. He did not engage Reinland to "dispose" of this tank. There is no evidence that Jackson required Reinland and Beck to remove the tank from the Jackson Property, even if we assume Jackson knew it was there. Jackson testified that Reinland was not obligated to take every single item—everything Reinland did not want to take would remain on the property. This undisputed evidence undermines Schuck's contention that Jackson engaged in the act of disposing the tank.

The undisputed evidence further established that Jackson sold Reinland some specific items and a right to take "scrap metal" from the property. It was up to Reinland to determine what fit the description of "scrap metal" and what did not. And Schuck did not present evidence that Reinland was acting as Jackson's agent. Because the only act that Jackson engaged in was the sale of goods to Reinland, it cannot be said that Jackson engaged in an abnormally dangerous activity.

*Schuck's Claim under HWMA*

Finally, Schuck argues that Jackson owed him a statutory duty of care under the HWMA. The purpose of the HWMA "is to establish a comprehensive statewide framework for the planning, regulation, control, and management of hazardous

14

waste which will prevent land, air, and water pollution and conserve the natural, economic, and energy resources of the state." RCW 70.105.007. The HWMA gives the Department of Ecology the authority to regulate these processes. RCW 70.105.007(1). The HWMA imposes civil penalties for those who do not comply with chapter 70.105 RCW or with the associated rules and regulations. RCW 70.105.080. A person injured as a result of an HWMA violation may seek damages. RCW 70.105.097; *see also Hickle v. Whitney Farms, Inc.*, 148 Wn.2d 911, 919, 64 P.3d 1244 (2003).

The HWMA regulations are codified in chapter 173-303 WAC. The chapter applies to: "(1) [g]enerators; (2) [t]ransporters; (3) [o]wners and operators of dangerous waste recycling, transfer, storage, treatment, and disposal facilities; and (4) [t]he operator of the state's extremely hazardous waste management facility." WAC 173-303-020.

A generator "means any person, by site, whose act or process produces dangerous waste or whose act first causes a dangerous waste to become subject to regulation." WAC 173-303-040. Generators of solid waste have a duty to determine whether or not the waste they produce is regulated by the HWMA. *Hickle*, 148 Wn.2d at 919. And the regulations require a person generating a solid waste, including recyclable materials, to follow a proscribed procedure to determine

whether or not their solid waste is designated as a dangerous waste under WAC 173-303-070(1)(b).[8]  *Id.* at 920.

Schuck argues that Jackson was a "generator" of hazardous waste because he effectively operated a junk yard by allowing people to dump anything, including an apparently abandoned chlorine gas tank, on his property.  But Schuck's interpretation of the word "generator" in the regulation is overly broad and not supported by the text.  To "generate" means to "cause to be" or to "bring into existence."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 945 (2002).  The WAC definition of a "generator" is consistent with this dictionary definition, as it clearly limits the category of "generator" to the person who, through his own conduct, creates the hazardous waste or the person whose action "first" causes the waste to become subject to regulation.  Thus, to establish generator liability under the HWMA, Schuck would have to produce evidence that Jackson either engaged

---

[8] (1) Purpose and applicability.
. . .
(b) The procedures in this section are applicable to any person who generates, or discovers on their site, a solid waste, as defined in WAC 173-303-016 (including recyclable materials) that is not exempted or excluded by this chapter, or by the department, or who is directed to or must further designate waste by subsection (4) or (5) of this section. Any person who generates or discovers a solid waste on their site must make an accurate determination if that waste is a dangerous waste in order to ensure wastes are properly managed according to applicable dangerous waste regulations.  A dangerous waste determination is made by following the designation procedures set forth in subsection (3) of this section.  Any person who determines by these procedures that their waste is designated DW or EHW is subject to all applicable requirements of this chapter.

in a process, the product of which was a waste defined as hazardous under the regulations, or that he was the *first* person to dispose of the waste (and thus caused the tank to become a hazardous waste subject to regulation).

Schuck has no such evidence. Jackson testified that he did not use chlorine gas in his business operations, that he did not purchase or fill the tank, and that he did not know who disposed of the tank on his property. Based on this record, Schuck failed to create a genuine issue of material fact that Jackson was a generator of hazardous waste within the meaning of chapter 173-303 WAC. The trial court did not err in dismissing the HWMA claim.[9]

We affirm the trial court's dismissal of Schuck's claims against Jackson.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Andrus, J.

WE CONCUR:

_____           _____
Lawrence-Berrey, J                                   Pennell, C.J.

---

[9] Schuck also argues on appeal that Jackson was subject to liability under the HWMA because he was operating a hazardous waste facility on his property. But Schuck conceded below that he was *not* making this argument. Schuck also explicitly said that his claims "against the Jacksons/Ibex under the HWMA are based on their status as 'generators.'" We thus decline to address this alternative argument on appeal.

17